**PERIODICAL DISTRIBUTORS, INC.,**
Plaintiff,

v.

The **AMERICAN NEWS COMPANY**, Inc., Union News Company, Inc., Henry Garfinkle, Pacific News Company, Inc., and the Manhattan News Company, Inc., Defendants.

**60 Civ. 3504.**

United States District Court
S. D. New York.

Oct. 15, 1968.

 

---

Arthur Fink and Norman Solovay, New York City, of Fink, Weinberger & Levin, New York City, for plaintiff.

Eugene Frederick Roth, Barrett G. Kreisberg, and Louis Lauer, New York City, for defendants The American News Company, Inc., Union News Company, Inc., and Henry Garfinkle.

Michael P. Direnzo and Harry Amer, New York City, for the defendant Pacific News Company, Inc.

Lewis A. Schein, New York City, of Di Falco, Field, Florea & O'Rourke, New York City, for defendant The Manhattan News Company, Inc.

## MEMORANDUM

GRAVEN, District Judge.

1. In this action the plaintiff seeks to recover damages and to secure injunctive relief because of the claimed violations by the defendants of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. Secs. 1 & 2, in connection with the distribution of periodicals in the New York Metropolitan area. The Greater Boston Distributors, Inc., was originally a defendant. The action was dismissed as to it for lack of jurisdiction. The trial was to the Court. For convenience, the words "The" and "Inc." will be omitted from the names of the corporate defendants.

The particular area of the New York Metropolitan area involved consists of the Boroughs of Manhattan, Bronx, Queens, and Kings of New York City and Nassau and Suffolk Counties. In the testimony of the witnesses and in the exhibits and in the briefs of the attorneys the Borough of Manhattan is interchangeably referred to as New York County or Manhattan; the Borough of Queens is interchangeably referred to as Queens County or Queens; the Borough of Kings is interchangeably referred to as Kings County or Brooklyn. The area lying to the east of Queens is referred to as Long Island. The periodicals involved consisted in the main of magazines and pocket books. There is not involved the distribution of newspapers.

2. The plaintiff was and is a local wholesale distributor of periodicals in the New York Metropolitan area. Its original corporate name was Periodical Distributors of Greater New York. It commenced this action on September 8, 1960. In its complaint it set forth three causes of action. In its first cause of action it alleged that the defendants had conspired and continued to conspire to deny it access in general to the retail newsstands operated by the defendant Union News Company. In its second cause of action it alleged that the defendants had conspired and continued to conspire to deny it access in particular to the retail newsstands operated by the defendant Union News Company at the La Guardia Airport. In its third cause of action it alleged that the defendants had conspired and continued to conspire to deny it access in particular to retail newsstands operated by the Union News Company at various stations of the Long Island Railroad and other places in Queens, Nassau and Suffolk Counties. The plaintiff alleged that the conspiracy referred to in the three causes of action commenced about June 24, 1957. On October 5, 1964, a Pretrial Order signed by a Judge of this Court was entered herein. That Order defined the issues based upon the allegations that the conspiracy commenced about June 24, 1957. In January, 1967, the plaintiff moved to amend the Pretrial Order in regard to the time of the commencement of the conspiracy, the parties to the conspiracy, and the scope of the conspiracy. The substance of the motion was that the plaintiff following the entering of the Pretrial Order on October 5, 1964, had discovered the existence of an over-all conspiracy commencing in 1947 on the part of the defendants and certain other

alleged co-conspirators which had for its object and purpose the unlawful restraint and monopolization of the distribution of periodicals in the New York Metropolitan area. The alleged co-conspirators consisted of a number of distributors of periodicals and certain members of a union known as the Newspaper and Mail Deliverers Union. The plaintiff's motion to amend the Pretrial Order was granted on January 23, 1967. The plaintiff did not ask, nor has it asked, that the alleged co-conspirators be made parties to this action.

3. The plaintiff is a New York corporation with its principal place of business at Long Island City, Borough of Queens. It was founded in 1951 and since 1952 it has been engaged in the wholesale distribution of periodicals in the New York Metropolitan area. The defendant American News Company formed in 1894. Its principal place of business is in the Borough of Manhattan. The defendant Union News Company, referred to in the plaintiff's complaint, is a New York corporation formed in 1894 which up until 1960 was a wholly owned subsidiary of the defendant American News Company. In 1960 it was dissolved as a corporation and has since that time been operated as a division of that defendant. The defendant Manhattan News Company is a New York corporation formed in 1947. Its principal place of business is in the Borough of Manhattan. The defendant Pacific News Company is a New York corporation formed in 1955 with its principal place of business in the Borough of Kings. The defendant Henry Garfinkle is a resident of the State of New York. Up until 1955 he was the president of the defendant Manhattan News Company. All of the stock of that corporation was and is owned by his wife and trustees for his two sons. In 1955 he resigned as president of the defendant Manhattan News Company and became the president of the defendant American News Company. He was the owner of the stock of a New York corporation, the Garfield News Company, one of the alleged conspirators.

In the amended Pretrial Order the contentions of the plaintiff are stated as follows:

"3. (b) Plaintiff contends that all defendants, together with various other co-conspirators (some of whom are hereinafter described, but not named as parties), entered into a continuing unlawful combination, plan and conspiracy to control, and restrict the persons by whom and terms on which distribution of periodicals could be made, and to attempt to monopolize and to monopolize the wholesale and retail distribution of periodicals, in the Metropolitan New York area and elsewhere, and pursuant to such combination, plan and conspiracy, the defendants and co-conspirators did, in fact, restrict free access to, and trade in the fields of wholesale and retail periodical distribution, and attempted to and did in fact monopolize the aforesaid fields.

"The aforesaid combination, plan, and conspiracy is alleged to have commenced in or about 1947, to have substantially continued to date, to have affected, impaired and restrained the free flow of periodicals among the several states and to have injured plaintiff's business and trade. It is alleged that all the defendants were originally party or became party thereto, together with various other co-conspirators not named as parties to this action, including (1) various members of the Newspaper and Mail Deliverers Union, such as Carmine Pellegrino, Victor Pellegrino, William Walsh, Harry Walzer, Joseph Simons, William Fello, Rocco Fello, also known as Barney Fello, Angelo Lospinuso, John Lawrence, Jr., Sam Feldman, Michael Spozate, Leon Braunstein, Joseph Baer, and others to plaintiff presently unknown; (2) Bronx County News Corp. and individual principals thereof; (3) Bi-County News Corp. and the successors in interest thereto including G. & S. Corporation

and the individual principals thereof; (4) Seljan News Co., Inc. and individual principals thereof, including Joseph Weinstein and Morris Cohen; (5) Imperial News Co., Inc. and its predecessors in interest and the individual principals thereof; (6) Brooklyn News Co., Inc. and individual principals thereof; (7) Solomon Levine; (8) William Levine; (9) Charles Gordon, formerly known as Abraham Goldberg; (10) Selig Goldberg; (11) Irving Bitz, also known as Morris Grossman; (12) Curtis Publishing Company and its subsidiary companies, including Curtis Circulation Company and the other so-called 'Curtis Distributors' not specifically hereinabove named, who were organized as such in or about 1947; (13) Victor Lance; (14) Select Magazines, Inc. (to date, by operation of law, as an unwilling participant); (15) G. I. Distributors, Inc. and individual principals thereof; (16) The Garfield News Company ('Garfield'); and (17) The Greater Boston Distributing Co., Inc. ('Boston'); and others to plaintiff presently unknown.

"Pursuant to and in furtherance of the aforesaid conspiracy, defendants, *inter alia*, conspired among themselves and with various of the co-conspirators to deny plaintiff access to certain retail newsstands, to deprive plaintiff of profitable business and to otherwise interfere with and hinder plaintiff's operations. These and other acts of defendants done in concert with various of the above-named co-conspirators had the effect of and, at least in part, the purpose of restraining, interfering with and making it more costly for plaintiff to conduct its business as a wholesale distributor of periodicals and to compete with defendants Manhattan, Pacific and with other of the co-conspirators.

"Plaintiff further contends that defendant HENRY GARFINKLE, individually, together with American, Union, Manhattan, Garfield and Boston (all of which companies are owned or controlled by defendant Garfinkle), have violated Sections 1 and 2 of the Sherman Act by monopolizing or attempting to monopolize commerce and trade in so-called 'terminal newsstands, and in the wholesale distribution of magazines in New York County, Boston and elsewhere; that HENRY GARFINKLE, American, Union and Garfield, because of their dominance over and monopoly position in such terminal newsstands, are guilty of violating the antitrust laws merely by virtue of their arbitrary and unjustified refusals to deal with plaintiff, exclusive of the existence of the combination, plan or conspiracy hereinabove described; and that defendant Garfinkle and companies with which he is associated and/or controls, including defendants Manhattan, American and Union, and co-conspirators Boston and Garfield, have violated Section 1 of the Sherman Act by virtue of reciprocal buying and selling arrangements."

4. The general structure of the distribution of periodicals will first be noted. The term "periodicals" as used in the industry does not include newspapers. It does include paperback books and comic books. In the industry there are what are referred to as national distributors, local wholesale distributors, and retailers. The national distributors distribute periodicals nationwide. The national distributors send the periodicals distributed by them to local wholesale distributors for distribution by them to the newsstands and other retail outlets. In some cases the publishers of periodicals function as national distributors of the periodicals published by them. In some cases such distributors also distribute periodicals published by others. Some national distributors distribute only periodicals published by others. In some instances a national distributor functions as a local wholesaler in a certain area or areas.

It is estimated that there are over 100,000 retail outlets for periodicals in the country. There are numerous types

of retail outlets. The greater number of such retail outlets consists of stores and other places of business, the proprietors of which sell periodicals in connection with and as a part of their regular businesses. A substantial number of retail outlets consist of newsstands operated independently of other businesses. Newsstand space in areas under public control is usually put up for bidding at certain intervals. Newsstand space in areas under private control may be obtained either by bidding or by negotiation. Newsstands and other retail outlets obtain the periodicals to be retailed from one or more local wholesalers. In most areas of the country there is only one local wholesaler. In some areas, including the New York Metropolitan area, there is more than one local wholesale distributor. Where there are two or more local wholesale distributors in an area there are two matters which are of prime importance to them. The first is the securing of distribution rights from the national distributors. Those rights are commonly referred to as franchises. A franchise consists of an agreement between a national distributor and a local wholesaler in which the latter is granted the right to distribute in a certain area or areas for some or all of the periodicals for which the former has distribution rights. The titles of the periodicals being distributed by national distributors are in excess of one thousand. Some of the titles have only a limited sale and the franchises for them are not particularly sought after by local wholesalers. In the New York Metropolitan area there are a number of local wholesalers who only have franchises for such periodicals. They are commonly referred to as secondary local wholesalers. There are several periodicals with a large national circulation for which there is a large demand at the retail outlets. These are commonly referred to as major periodicals or prime periodicals. Franchises for such periodicals are particularly sought after by local wholesalers.

In the New York Metropolitan area there are several thousand retail outlets for periodicals. Many of such outlets sell only a limited number of periodicals. A number of such outlets are so situated that they have a very large volume of sales of periodicals. Typical of such outlets are railroad stations, airports, certain subway stations, bus depots, large hotels and large business and office buildings.

5. For some time prior to 1947 one of the largest local wholesalers in the New York Metropolitan area was the Interborough News Company. It encountered business difficulties and in 1947 it went out of business. In 1949 it instituted an action in this Court against a number of national distributors and local wholesalers seeking treble damages under the Sherman Act. It alleged that the defendants had unlawfully conspired to restrain and monopolize the distribution of periodicals in the New York Metropolitan area. In the District Court it was denied recovery. Interborough News Co. v. Curtis Publishing Co., et al. (D.C.S.D.N.Y.1954), 127 F.Supp. 286. On appeal the denial was affirmed. Interborough News Co. v. Curtis Publishing Co. (2d Cir. 1955), 225 F.2d 289. See, also, Interborough News Co. v. Curtis Pub. Co., et al. (D.C.S.D.N.Y.1952, 108 F.Supp. 768.

It is the claim of the plaintiff that the conspiracy referred to by it in the amended Pretrial Order had its origin in 1947 in connection with and following the breaking up of the Interborough News Company and that such conspiracy has continued up to the present time. In the present case there were numerous references to that litigation and situations and events connected therewith. The Court is of the view that the evidence in this case does not adequately connect the events and situations portrayed in that litigation with the events and situations which are of possible pertinence in the present litigation. The Court is of the view that the events and situations which are of possible pertinence in this litigation are the events oc-

curring and the situations arising from and after 1951.

6. The plaintiff was organized in 1951. It commenced its operations in 1952. It was formed to distribute periodicals in the New York Metropolitan area and has always held itself as such. However, except for a period of time when it distributed in Nassau and Suffolk Counties, its distribution has been largely in Manhattan and in Queens. It appears that in recent years around 70 per cent of its sales are made in Manhattan and 30 per cent in Queens. At the present time it serves around 600 retail outlets in Manhattan. The number of retail outlets it serves in Queens does not appear.

The defendant American News Company from the time of its formation in 1894 and until around June, 1957, functioned both as a national distributor and as a local wholesaler of periodicals. It also carried on other activities. It was a large corporation with 5400 stockholders. Its stock was and is listed on the New York Stock Exchange. It had over 300 branches in the country. It employed several thousand employees in connection with its periodical distribution activities. The defendant Union News Company, its wholly owned subsidiary, operated around 900 newsstands in the country. The defendant American News Company was the local wholesaler for those newsstands. It appears that the number of Union News Company newsstands in the country has declined to around 700. A substantial number of the Union News Company newsstands were and are located in the Metropolitan area of New York. At the present time there are around 130 Union News Company newsstands in Manhattan, a few in Queens, a few in Kings, and a few in Nassau and Suffolk Counties. Up until about June, 1957, the Union News Company newsstands in the New York Metropolitan area were served by the American News Company as a local wholesaler.

The defendant Manhattan News Company, founded in 1947, was and is a local wholesaler in Manhattan. Up until 1957 it was a competitor of the American News Company in the wholesale distribution of periodicals in Manhattan. Commencing with its formation, it was and since has been the local wholesaler for the Garfield News Company owned by the defendant Henry Garfinkle. The Garfield News Company operated and operates six or seven newsstands in Manhattan. It operates newsstands at the Newark, New Jersey, Airport and at least one in Bronx.

In 1955 the defendant Henry Garfinkle and the members of his family acquired 11 per cent of the stock in the defendant American News Company. Soon thereafter he became its president. Upon becoming its president he resigned as president of the defendant Manhattan News Company. The defendant American News Company, notwithstanding its great size and notwithstanding its apparent dominance in the periodical distribution field, commencing in the fifties began to encounter difficulties. It lost franchise after franchise and began sustaining heavy losses. By 1957 it had sustained losses in connection with its distribution of periodicals in excess of $8,000,000.00. In 1957 it decided to cease its activities as a national distributor and local wholesaler. It laid off around 8,000 of its employees and sold all of the equipment used in connection with its distribution activities. By June, 1957, it was entirely out of business as a national distributor and as a local wholesaler. It still retained its stock ownership of the defendant Union News Company. It still has a number of activities unrelated to periodical distribution.

For some years prior to 1957 the defendant Manhattan News Company had the franchises for most of the major periodicals for Manhattan. However, the defendant Union News Company's newsstands were excluded from those franchises. The defendant Union News Company's newsstands in Manhattan were served by the defendant American News Company. When the defendant

American News Company went out of business as a local wholesaler, the defendant Manhattan News Company secured the right to serve the defendant Union News Company's newsstands in Manhattan and has continued to serve them. It has never served the defendant Union News Company's newsstands outside of Manhattan. It was heretofore noted that the plaintiff in its complaint alleged that the conspiracy referred to commenced on or about June 24, 1957. That was the time the American News Company went out of business as a national distributor and local wholesaler.

7. Select Magazines Incorporated is a national distributor owned by the publishers of several major periodicals. Those publishers were Time, Inc., publisher of "Time," "Life," "Sports Illustrated," and "Fortune"; Readers Digest Association, publisher of "Readers Digest"; McCall Corporation, publisher of "McCall's" and "Redbook"; Meredith Publishing Company, publisher of "Better Homes and Gardens." It also distributed periodicals not published by the owners. Among such periodicals was "United States News & World Report." The publisher Street & Smith was at one time an owner but it ceased to be such.

Select Magazines Incorporated is referred to as SM. It is one of the two largest distributors of periodicals in the country. The periodicals distributed by it are referred to as SM periodicals. Those periodicals are regarded in the industry as being major or prime periodicals.

At the time the plaintiff commenced operations, the Seljan News Company had a SM franchise for a portion of the northwest area of Queens. The Bukzin News Company also had a SM franchise for another portion of that area. The Bukzin News Company also had a SM franchise for a large area in eastern Queens and for an area in Brooklyn. In 1954 the plaintiff was successful in obtaining the SM franchise for those portions of the northwestern part of Queens formerly franchised to the Seljan News Company and the Bukzin News Company. In 1954 the Bukzin News Company went out of business. On May 27, 1955, the defendant Pacific News Company secured the SM franchise for that portion of Queens and Kings formerly franchised to the Bukzin News Company. It appears that the Imperial News Company has and had a SM franchise of that portion of Queens lying to the south of the area in the northwestern part of Queens which is franchised to the plaintiff. The plaintiff over the years has made efforts to serve SM franchises for other areas in the New York Metropolitan area, including Manhattan. In 1958 it was successful in securing the SM franchise for Nassau and Suffolk Counties. It has not been successful in obtaining the SM franchise for Manhattan held by the defendant Manhattan News Company. The SM franchises in the New York Metropolitan area are very much a matter of controversy in the present litigation.

In 1957, as heretofore noted, there was the development of the defendant American News Company ceasing to operate as a local wholesaler in the New York Metropolitan area. There were certain other developments in that area which enter into the situation. In 1955 the defendant Pacific News Company was formed. It operated as a local wholesaler in portions of Kings, Queens, and in Nassau and Suffolk Counties. It was heretofore noted that in 1955 it secured the SM franchises for that portion of Queens and Kings formerly franchised to the Bukzin News Company.

Prior to 1958 a local wholesaler, the Brockaway News Company, was operating in Nassau and Suffolk Counties. It had the franchises for a large number of periodicals, including the SM periodicals. In 1958 it went into bankruptcy and its franchises were up for allocation. In 1958 a corporation known as Bi-City News Company was formed to operate as a local wholesaler in the area formerly served by the Brockaway News Company in Nassau and Suffolk Counties.

The plaintiff in 1957 commenced operating as a local wholesaler in Nassau and Suffolk Counties for periodicals distributed by it. Those periodicals did not include SM periodicals. By November, 1958, it had acquired around 600 retail outlets. On November 19, 1958, following the bankruptcy of the Brockaway News Company, the plaintiff and SM entered into a franchise contract under which the plaintiff was given the SM franchise for Nassau and Suffolk Counties, except for the Long Beach territory. The contract was for two years with the right on the part of either party to terminate the contract by giving thirty days' notice. At the time of making the contract SM orally agreed to make operational subsidy payments to the plaintiff in connection with its distribution of SM periodicals in the area designated. The SM franchise for the Long Beach territory excluded from the plaintiff's contract was given to the defendant Pacific News Company.

The defendant Union News Company has some newsstands in Nassau and Suffolk Counties. Around 19 of those newsstands are along the Long Island Railroad. Those are small part-time newsstands whose principal sales are newspapers rather than periodicals. SM periodicals have never been handled by those newsstands. The Union News Company has a few newsstands in Kings. It has a few newsstands in Queens, the most important of which are its newsstands at the La Guardia Airport. That Airport is situated in the northwestern part of Queens. Since 1957 its newsstands in Kings and Queens have been supplied with SM periodicals by the defendant Pacific News Company. The supplying of SM periodicals to the newsstands of the defendant Union News Company is also very much a matter of controversy in the present litigation.

The operational subsidies which SM agreed to pay the plaintiff for distributing its periodicals in Nassau and Suffolk Counties proved to be very heavy and burdensome. They ranged from $2,500.00 to $10,000.00 a month. By 1961 the operational subsidies paid by SM to the plaintiff with the figures for five months missing amounted to $188,483.67. On July 21, 1961, SM terminated its contract with the plaintiff by giving thirty days' notice.

When the plaintiff learned that its SM franchise was going to be terminated, it arranged for a sale of its franchises for Nassau and Suffolk Counties and the inventory and equipment used in connection with those franchises to Bi-City News Company for around $72,000.00. The Bi-City News Company did not secure the SM franchise.

8. The plaintiff in its third cause of action set forth in its complaint alleges that because of the conspiracy referred to it was denied access to the newsstands of the defendant Union News Company in Nassau, Suffolk and Queens Counties. It claims that by reason of the alleged illegal conspiracy it lost its SM franchise for Nassau and Suffolk Counties and was forced to sell its franchises, inventory and equipment at forced sale at much below their real value. The defendant Union News Company contends that the few small newsstands it operated in Nassau and Suffolk Counties were not of significance in connection with the loss by the plaintiff of its SM franchise for those Counties. The defendants contend that the sole and only reason for the plaintiff losing its SM franchise for Nassau and Suffolk Counties was the desire of SM to free itself of the heavy and burdensome operational subsidy payments required of it under its contract with the plaintiff.

The plaintiff in its second cause of action set forth in its complaint alleges that by reason of the illegal conspiracy referred to it was denied access to the newsstands of the defendant Union News Company at the La Guardia Airport. The La Guardia Airport, as heretofore noted, is situated in the northwestern part of Queens. The plaintiff since 1954 has had the SM franchise for the northwestern part of Queens, except

the La Guardia Airport. At the time it entered into its first SM franchise contract for that area, it was understood between the plaintiff and SM that the La Guardia Airport was not included in the franchise. At the time those newsstands were being served by the defendant American News Company. In a later franchise contract between them, the La Guardia Airport was specifically excluded.

Prior to and since 1954 the defendant Union News Company has operated newsstands at the La Guardia Airport. Its right to operate newsstands there was procured by bidding. Up until 1957 those newsstands were served by the defendant American News Company. The only franchise that the plaintiff has had or has for major periodicals in the northwestern part of Queens has been and is the SM franchise. The Seljan News Company which operates in the same general area has franchises for most of the other major periodicals.

After the defendant American News Company went out of business in 1957, the defendant Union News Company made arrangements to have the Seljan News Company service its newsstands at the La Guardia Airport. As heretofore noted, the Seljan News Company did not have a SM franchise. For a period of time in 1957 there were no SM periodicals on the newsstands of the defendant Union News Company at the La Guardia Airport. The defendant Pacific News Company in 1957 had a SM franchise which included the lower portion of Queens and a portion of Kings. SM was desirous of having its periodicals on sale at the newsstands of the defendant Union News Company at the La Guardia Airport. In September, 1957, SM and the defendant Pacific News Company entered into a contract amending the previous franchise contract between them as to Queens and Kings so as to include La Guardia Airport, and thereafter and since the defendant Pacific News Company has supplied SM periodicals to the newsstands of the defendant Union News Company at that Airport.

Thereafter and since those newsstands have been supplied by two local wholesalers. The defendant Pacific News Company supplies them with SM periodicals and the Seljan News Company supplies them with other periodicals.

The newsstands of the defendant Union News Company at the La Guardia Airport consist of two fixed newsstands and one portable newsstand. In 1967 the total sales of those newsstands amounted to $77,040.56. Forty per cent of the periodical sales at those newsstands were the proceeds of the sales of SM periodicals, and 60 per cent of the proceeds of the sales were of other periodicals supplied to it by the Seljan News Company. It appears that the defendant Union News Company has had either minimal profits or losses in the operation of those newsstands.

It was heretofore noted that the plaintiff complains of it being denied access as a wholesaler to the newsstands of the defendant Union News Company at the La Guardia Airport. In connection with that complaint the defendant Union News Company asserts that those newsstands have been and are being served by two local wholesalers and that it was and is under no duty to take on the plaintiff as a third local wholesaler. The defendant Union News Company further asserts that the defendant Pacific News Company was satisfactorily serving its newsstands in a nearby Queens area and it preferred to have it supply newsstands at La Guardia Airport with SM periodicals. The defendant Union News Company further asserts that the Seljan News Company operating in the La Guardia Airport area has franchises for more of the periodicals it desires to handle than does the plaintiff.

It is to be noted that the matter of the newsstands at the Kennedy International Airport is not involved in the present litigation. It appears that at that Airport there are a number of independent newsstands and a couple of newsstands of the defendant Union News Company. It is also to be noted

that the defendant Manhattan News Company has never served the newsstands of the defendant Union News Company at the La Guardia Airport. It does not and has not served any newsstands of the defendant Union News Company located outside of Manhattan.

9. In the New York Metropolitan area there has been a wide distribution of SM franchises among the various local wholesalers. Of those franchises the plaintiff has one and did have two. While the plaintiff makes the general claim that the defendants and their alleged co-conspirators have unlawfully conspired to restrain and monopolize the distribution of periodicals in the New York Metropolitan area as a whole, it more particularly complains of the defendant Manhattan News Company being the only local wholesaler for SM and other major periodicals in Manhattan and of its being the only local wholesaler for the newsstands of the defendant Union News Company and the Garfield News Company in Manhattan.

The defendant Manhattan News Company distributes the periodicals for which it has franchises to around 1,250 retail outlets in Manhattan. It at one time distributed to around 1,800 retail outlets. It distributes and will distribute the periodicals for which it has franchises to any retailer in Manhattan irrespective of whether such retailer is also being served by one or more other local wholesalers.

Included in its present retail outlets in Manhattan are around 130 newsstands of the defendant Union News Company. Among the Union News Company's newsstands are newsstands in Grand Central and Pennsylvania Stations. The defendant Manhattan News Company also distributes to the Garfield News Company. That Company has six or seven newsstands in Manhattan. For a number of years a company known as the ABC Company vended periodicals by means of vending machines in various subways. Some time ago the defendant Manhattan News Company at the request of the New York Transit Authori-

ty took over the servicing of those machines. There has been a decline in the number of those machines.

10. In the distribution of periodicals there is one feature that is of importance and that is the matter of the return of unsold periodicals for credit. Upon delivery of periodicals to a retailer, the latter is charged for them at the wholesaler's selling price. However, a retailer has the right to return unsold copies to the local wholesaler for credit. The local wholesaler is, in turn, given credit by its national distributors for the unsold copies. In some instances the unsold copies are returned by the local wholesaler to the national distributor. In other instances the first pages of the unsold periodicals are returned. In other instances the national distributor accepts an affidavit as to the number of unsold copies. The distribution of periodicals and the handling of their returns involves a large amount of checking and record keeping.

The handling of returns is a very large and important part of the business of local wholesaling. All local distributors maintain what are referred to as return rooms. The employees in the return rooms, in general, constitute a separate unit for collective bargaining purposes.

11. It appears that for a long period of years, which period extended long prior to the formation of the plaintiff, the defendant Union News Company and its owner, the American News Company, had throughout the country followed the policy of selecting only one local wholesaler for the newsstands of the defendant Union News Company. It is the claim of the defendant Union News Company that because of the several hundred periodicals retailed at its newsstands and the myriad of details in connection with the receiving and returning of those periodicals it makes for a more economical and satisfactory operation to have only one local wholesaler with which to deal. It was heretofore noted that its periodicals at La Guardia Airport are served by two independent

local wholesalers. In that connection the defendant Union News Company asserts that there was a special situation there which made it desirable to have two local wholesalers.

The plaintiff contends that the one wholesaler policy of the defendant Union News Company unlawfully restrains the distribution of periodicals in Manhattan. That defendant asserts that in so doing it is only following its long-time country-wide policy. That defendant further asserts that the one wholesaler policy is a matter of business judgment and that it has been and is of the opinion that it regards the one wholesaler policy to be the better business policy. The plaintiff controverts the economic wisdom of that policy.

It appears that the defendant Manhattan News Company is the largest distributor of periodicals in Manhattan. This is due to the fact that it has the franchises for Manhattan for SM and most of the other major periodicals and that it is the supplier of periodicals to the newsstands of the defendant Union News Company in Manhattan. The plaintiff over the years made attempts to take the SM franchise for Manhattan away from the holder thereof, but it has not been successful. It also appears that the large volumes of sales by the defendant Manhattan News Company in Manhattan are due to it supplying the newsstands of the defendant Union News Company in that area, several of which have large volumes of sales. Among those newsstands are its newsstands in Grand Central and Pennsylvania Stations. The defendant Union News Company over the years has been the successful bidder for newsstand space in those Stations. The contention of the plaintiff is, in substance, that as a result of the alleged conspiracy it has been and is being denied to be a local wholesaler for the periodicals of the defendant Union News Company in Manhattan and having the SM franchise for Manhattan.

12. The plaintiff makes a number of contentions. One of its contentions is that there has been and is an unlawful alliance between certain of the local wholesalers and the Newspaper and Mail Deliverers Union to illegally restrain its distribution of periodicals in the New York Metropolitan area. In that connection it asserts that the defendant Henry Garfinkle and certain officers of the defendant Manhattan News Company and the defendant Pacific News Company and certain members of the Newspaper and Mail Deliverers Union have been and are the more active participants in that alliance. In that connection the plaintiff refers to certain matters which will next be noted.

The Newspaper and Mail Deliverers Union is a very strong and aggressive union. It has collective bargaining contacts with fifteen local wholesalers in the New York Metropolitan area covering the route men, drivers, and warehouse workers employed by them. It is not a collective bargaining agent for all of the employees of those wholesalers. Their office employees belong to another union or unions. Their mechanics belong to another union. Their return room employees, except the return room employees of the plaintiff, are members of the Teamsters Union. In the case of the plaintiff, its return room was organized by the Newspaper and Mail Deliverers Union. That Union is referred to as NMDU. The local wholesalers in the New York Metropolitan area have never formed a trade association. It appears that a number of the larger local wholesalers in that area are referred to as the City Wholesalers. Over the years when it came time to renew their contracts with NMDU, they joined in selecting an attorney to conduct bargaining negotiations in their behalf. The plaintiff complains of the fact that it was not included in those negotiations. When the plaintiff sought to have the attorney negotiate for it along with the other wholesalers, the Seljan News Company objected on the ground that the plaintiff was a competitor of it in the same area. The attorney did not act for it in the bargaining negotiations. After the at-

torney had negotiated contracts for the wholesalers he represented, the officials of NMDU entered into negotiations with the plaintiff and the plaintiff subsequently would sign a contract similar to those signed by the members of the group for its route men, drivers, and warehouse workers. It was heretofore noted that the return room of the plaintiff was organized by NMDU whereas the return rooms of the group were organized by the Teamsters Union. The plaintiff asserts that this was part of a plan on the part of NMDU and the City Wholesalers to place it in a disadvantageous position in the matter of competition. In that connection it asserts that the contracts between the members of the group and the Teamsters Union were so-called "sweetheart contracts" which provided for lower wage scales than did the plaintiff's contract with NMDU. It appears that at the time of the trial only two employees of its return room belonged to NMDU and that the balance of the employees in that room were part-time employees who were not required to be members of the Union. It appears that the terms of the contracts that the plaintiff has had with the NMDU as to its route men, drivers, and warehouse workers are not substantially different from those between NMDU and the City Wholesalers as to their route men, drivers, and warehouse workers.

It appears that over the years the various local wholesalers have had numerous difficulties with the NMDU. Some of the activities of certain members of NMDU were the subject of an investigation by a Committee of the United States Senate. It appears that owners and officers of local wholesalers who had become members of the NMDU prior to becoming owners and officers could continue to be members of NMDU. It appears that two of the owners of the plaintiff have been and are members of NMDU.

It appears that NMDU looks with disfavor upon transfers of franchises and changes in distribution which may result in the laying off of its members or which may interfere with its collective bargaining contracts. Over the years there were numerous difficulties between the NMDU and the local wholesalers.

It is the contention of the defendant Manhattan News Company that during the period of time in question it had more difficulties with NMDU than did the plaintiff. In that connection it asserts that because two of the owners of the plaintiff have been at all times members of NMDU it has had and has a more favorable situation as to NMDU than it has had or has. It is the contention of the defendants that the existence of the alleged unlawful alliance between NMDU and certain of the local wholesalers is lacking proper and adequate evidentiary support.

13. The plaintiff contends that the defendant Manhattan News Company, by reason of its restriction of competition, has prevented it from securing retail outlets, distribution rights and franchises for periodicals in Manhattan. In response to that contention that defendant asserts that the plaintiff, notwithstanding the claimed illegal restraint on the distribution of periodicals, has built up a clientele of around 600 retail outlets in Manhattan. In response to that contention that defendant further asserts that over the years there has been a substantial attrition in the number of periodicals for which it has distribution rights in Manhattan. It points out that it lost 142 titles it formerly distributed for one national distributor and that it lost its franchise for the Dell Publishers which was a desirable franchise. It further points out that the plaintiff did not thereafter acquire the distribution rights in Manhattan to the 142 titles or the Dell Publishers' franchise for Manhattan. In connection with the Dell Publishers' franchise, the defendant Manhattan News Company points out that the plaintiff had and has the Dell Publishers' franchise for northeastern Queens. The defendant American News Company argues that the matters just

referred to tend to negative the claim of the plaintiff that it has improperly prevented the plaintiff from acquiring additional distribution rights and additional franchises for Manhattan.

In connection with the plaintiff's claim of unlawful restriction of competition, the defendant Union News Company points out that in recent years the Easton News Company, an independent newsstand operator, has built up a chain of 47 newsstands in Manhattan, including three newsstands in the Pan Am Building immediately adjacent to Grand Central Station; also including newsstands in a number of large business and office buildings and including a newsstand at the Washington Bridge Bus Terminal. That chain is served by three local wholesalers, one of which is the defendant Manhattan News Company.

The plaintiff asserts that it would be able to render better service in the distribution of SM periodicals in Manhattan than is being rendered by the defendant Manhattan News Company. The defendant Manhattan News Company asserts that the present litigation constitutes but another attempt on the part of the plaintiff to take the SM franchise for Manhattan away from it. The defendant Union News Company asserts that what the plaintiff is seeking to do is to force it to take on the plaintiff as an additional wholesaler, which taking on would be contrary to its long established policy and contrary to what it deems to be its best business interests. In its prayer for relief the plaintiff asks, among other relief, that the defendant Union News Company be ordered "to make decisions with regard to purchases from plaintiff based upon its own best interests."

14. The plaintiff asserts that if it should be held that there was no over-all conspiracy to monopolize the distribution of periodicals in the New York Metropolitan area in general, yet there is still involved the matter of monopolization or attempted monopolization of a sub-market in the distribution of periodicals in the New York Metropolitan area, which alleged sub-market consists of what are referred to as terminal newsstands.

■■■ Section 1 of the Sherman Act (15 U.S.C.A. Sec. 1) forbids conspiracies and combinations in restraint of trade. Section 2 of the Sherman Act (15 U.S.C.A. Sec. 2) forbids the monopolization or attempted monopolization of trade. The plaintiff contends, and correctly so, that while there is some overlap between the two Sections yet the conduct prohibited under Section 2 is distinct from the conduct prohibited under Section 1. The plaintiff contends, and correctly so, that even though there be absent a conspiracy or combination prohibited by Section 1, antitrust liability may be imposed for monopolization or attempted monopolization under Section 2. In that connection it cites the case of United States v. United Shoe Machinery Corp. (D.C.1953), 110 F.Supp. 295, affirmed sub nom United Shoe Machinery Corp. v. United States (1954), 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910.

The plaintiff contends that what it describes as terminal newsstands constituted and constitute a sub-market and that the defendants Henry Garfinkle, Manhattan News Company, and Union News Company have monopolized or attempted to monopolize it. The term "terminal newsstand" is a somewhat loose and general term. In the industry it is generally regarded as referring to periodical retail outlets located in and near places having high traffic volume. Such places include airports, railroad stations, bus terminals, high rise office and business buildings, and large hotels. Such newsstands are characterized by large volumes of sales. It is the contention of the plaintiff that certain, at least, of the so-called terminal newsstands, especially in the New York Metropolitan area, have an importance beyond their sales volumes in that many of those having to do with the placing of advertising pass by such newsstands and are apt to be favorably impressed by the presence on those newsstands of periodicals contain-

ing advertisements in which they are interested and unfavorably impressed by the absence from those newsstands of such periodicals. The so-called terminal newsstands which the plaintiff asserts constitute a sub-market in the New York Metropolitan area are the Union News Company's newsstands at La Guardia Airport in Queens and in Grand Central and Pennsylvania Stations in Manhattan, and the newsstands of the Garfield News Company in the Port of Authority Bus Terminal Building in Manhattan.

An independent chain newsstand company operates the newsstand at the Washington Bridge Bus Terminal. An officer of that company testified that newsstands in bus terminals in Manhattan were of minor importance so far as terminal newsstands were concerned.

The newsstands of the defendant Union News Company at La Guardia Airport consisted of two fixed newsstands and one portable newsstand which did not have a particularly large volume of sales. An officer of the plaintiff testified that the plaintiff served some independent newsstands at that Airport. The number of independent newsstands it served there does not appear.

In connection with the existence of the alleged sub-market, the controversy largely revolves around the newsstands of the defendant Union News Company in Grand Central and Pennsylvania Stations where the defendant Union News Company has numerous newsstands with high volumes of sales. It appears that there are a number of newsstands clustered in and around Grand Central Station which are not owned by the defendant Union News Company. Four of those newsstands have very large volumes of sales. One of them has the largest sales of SM periodicals in the accounts of that organization. The Easton News Company, an independent operator of newsstands, has three newsstands with high volumes of sales in the Pan Am Building which has a ramp leading from Grand Central Station. It appears that there are newsstands located in numerous high rise office and business buildings and in large hotels which are not owned by the defendant Union News Company. The defendants contend that the claim of the plaintiff as to the existence of a sub-market is lacking in proper and adequate evidentiary support.

■ 15. The plaintiff has not established by a preponderance of the evidence the existence of the alleged sub-market.

■ 16. The plaintiff has not established by a preponderance of the evidence any wrongful conduct on the part of the defendants, or any of them, in connection with the termination of the plaintiff's SM franchise for Nassau and Suffolk Counties. It clearly appears that the sole and only cause of the termination of that franchise was the disinclination of SM to be further burdened with the heavy operational subsidy payments payable to the plaintiff thereunder.

17. The plaintiff has not established by a preponderance of the evidence the existence of the alleged unlawful alliance between NMDU and the defendants, or any of them, or their alleged co-conspirators.

18. The plaintiff has not established by a preponderance of the evidence any wrongful conduct on the part of the defendants, or any of them, in connection with matters relating to the distribution of periodicals by the defendant Union News Company at the La Guardia Airport.

19. The plaintiff has not established by a preponderance of the evidence that the defendants, or any of them, conspired and combined to unlawfully restrain competition in the distribution of periodicals in the New York Metropolitan area.

20. The plaintiff has not established by a preponderance of the evidence that the defendants, or any of them, monopolized or attempted to monopolize the distribution of periodicals in the New York Metropolitan area or in any particular area thereof.

21. The defendants have asserted a number of affirmative defenses. In view of the determinations made, it is not necessary to give consideration to those defenses.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this action and the parties thereto.

2. None of the defendants are liable to the plaintiff for the claimed violations by them of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. Secs. 1 & 2.

### ORDER FOR JUDGMENT

It is hereby ordered that judgment shall be entered ordering and adjudging that the plaintiff recover nothing from the defendants and that the plaintiff's complaint be dismissed with prejudice; and that final judgment on the claims asserted by it be rendered in favor of the defendants.

The foregoing constitutes the Findings of Fact, Conclusions of Law, and Order for Judgment herein.