DIEHL & SONS, INC., a New York Corporation, and Truck Rent-A-Center, Inc., a New York Corporation, Plaintiffs,

v.

INTERNATIONAL HARVESTER COMPANY, a Delaware Corporation, and International Harvester Credit Corp., a Delaware Corporation, Defendants.

No. 73 C 1436.

United States District Court, E. D. New York.

Nov. 29, 1976.

Coudert Brothers, New York City, for plaintiffs by James M. Rhodes, Joseph A. McManus, Anthony Williams, New York City.

Townley, Updike, Carter & Rodgers by Ronald S. Daniels, James K. Leader, New York City, and Kirkland & Ellis by Donald G. Kempf, Jr., Tefft W. Smith, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This private antitrust action was commenced on September 24, 1973 by Diehl & Sons, Inc. ("Diehl") and its subsidiary, Truck Rent-A-Center, Inc. ("TRAC"), against International Harvester Company ("Harvester") and International Harvester Credit Corporation ("IHCC"), its wholly-owned subsidiary. The original complaint has in effect been superseded by a supplemental complaint filed May 27, 1975, in which plaintiffs allege eight causes of action: two claims of § 1 conspiracy in restraint of trade, 15 U.S.C. § 1, and two claims of attempted monopolization, 15 U.S.C. § 2 (Counts One and Eight); two price discrimination claims, 15 U.S.C. § 13(a), (d) and (e) (Counts Two and Three); two Dealer-Day-In-Court-Act claims, 15 U.S.C. §§ 1221, et seq. (Counts Four and Five); and two State claims (Counts Six and Seven). Harvester has counterclaimed against Diehl for money allegedly due and owing on open account.[1]

The case is now before the court on defendants' motions for dismissal of all of plaintiffs' alleged claims for failure to state a claim, Rule 12(b)(6), F.R.Civ.P., or for summary judgment, Rule 56, F.R.Civ.P., and for summary judgment on Harvester's counterclaim for money owed.

## I.

In considering defendants' motion for summary judgment, the court will accept as true factual statements in plaintiffs' affidavits submitted in opposition to the motion and draw all permissible inferences in their favor. *Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2 Cir. 1976). With that in mind, the following facts appearing in the parties' affidavits do not seem to be in genuine dispute.

Harvester, whose principal offices are in Chicago, Illinois, manufactures trucks, parts and accessories, which it sells through both its own 151 sales branches and some 2,231 franchised dealers. IHCC's sole business is extending credit to finance vehicle sales.

Diehl, located in Queens, New York, was, until April 21, 1975[2] a distributor of Harvester trucks, parts and accessories. Diehl is owned and operated principally by John H. Schwenter and Robert L. Austin, both of whom are former Harvester employees who purchased the Diehl distributorship in 1963.[3] Since March 1971, Diehl has also been a distributor of trucks for Mercedes-Benz of North America and during July 1975, Diehl obtained a Volvo dealership. Plaintiff TRAC was organized in 1965 and is engaged in the leasing of trucks, chiefly Harvester trucks.

---

1. To date, numerous interrogatories have been propounded and answered, many documents have been produced and the deposition of one of plaintiffs' principals, Robert L. Austin, has been taken. His deposition has not been signed and according to plaintiffs is uncorrected and incomplete. Aff. of James M. Rhodes (5/23/75), ¶ 2. Accordingly, the court will not consider testimony contained therein in connection with defendants' motions. See Rule 30(e), F.R.Civ.P.

  Both sides have noticed the depositions of various other persons, but these have been adjourned pending resolution of these motions.

2. On that day, Harvester cancelled the Diehl dealership under § 28 of the Sales and Service Agreements allegedly for cause.

3. Austin began as a sales trainee with Harvester in 1949 and remained in its employ until 1963, when he resigned his post as sales promotion manager for the New York district and, together with Schwenter, purchased an established Harvester franchised dealership named Diehl. Schwenter was a Harvester salesman, zone manager and later retail branch manager from 1954 until 1963.

The contractual arrangements between Diehl and Harvester are governed by the provisions of a "Light and Medium Duty Dealer Sales and Service Agreement" and a "Heavy Duty Dealer Sales and Service Agreement." Both agreements provide for unilateral termination by Harvester only if Diehl breaches certain specified contractual obligations. §§ 27(c), 28.

Schwenter and Austin contend that since late 1970, the business relationship between Diehl and Harvester has continually deteriorated, leading to the commencement of this action in September 1973, and eventually to the cancellation by Harvester of the Diehl distributorship on April 21, 1975.

Both Schwenter and Austin attribute this erosion of their relationship with Harvester to the latter's design to increase its own sales branches' share of the retail market in its trucks and parts at the expense of its independent dealers. Instances of Harvester's "bad faith" fall generally into four major groups: intentionally slowing down delivery to Diehl of ordered trucks, inducing Diehl's customers to deal directly with Harvester, impairing Diehl's credit, and discriminating in price in favor of TRAC's competitors, all calculated to embarrass and ruin Diehl as an independent Harvester distributor.

The following examples are proffered in support of Diehl's charges.

In December 1973, Diehl placed an order for 15 trucks with Harvester for one of its most valuable customers, Beers, Inc. Harvester originally promised delivery by September 1974, which was important to Beers because new federal regulations concerning air brakes scheduled to go into effect March 1, 1975 would substantially increase the trucks' cost. When delivery was not made by September 1974, Austin contacted Harvester's regional office and was informed that due to a strike at one of Harvester's factories delivery could not be made before January 1975. On October 8, 1974, Diehl received a form notice from Harvester cancelling the order for ten of the trucks and giving as the reason for the cancellation Harvester's inability to manufacture the trucks prior to March 1, 1975. The form notice goes on to recite that the trucks may be reordered and will be processed in the same order as the original order. On October 15, 1974, Schwenter wrote Harvester complaining in strong language about Diehl's loss of good will and possible litigation resulting from Harvester's non-delivery prior to March 1, 1975 and expressing his belief that Harvester was trying to force Diehl out of business. The letter went unanswered. Diehl resubmitted the order at the increased price in November 1974. Harvester subsequently twice notified Diehl of further delays and, as of May 1975, only one truck had been delivered.

Austin suspected bad faith on Harvester's part because another truck order placed about the same time as the Beers order was filled only several months thereafter. Concededly, there was only one truck involved in that order and Diehl's customer exerted pressure directly on Harvester for quick delivery.[4]

In 1970, Diehl managed to lure a major truck lessee from Ford trucks to Harvester trucks. Diehl's client was to lease 27 trucks from TRAC but IHCC refused to finance Diehl's purchase of the trucks until Diehl and TRAC obtained a guarantee of the lease by another company at considerable expense to Diehl and TRAC. Schwenter contends IHCC financing is normally easily obtained. He further asserts that Harvester later stole this client's business altogether by having its San Francisco branch quote the client a price equal to or below dealer's cost. Harvester also refused to give Diehl a sales assistance commission for bringing the client to its attention.

Similarly, Diehl contends that beginning toward the end of 1972, Harvester's sales branches in the New York area began contacting Diehl's customers and offering to sell them parts at substantial discounts from dealer cost.

---

4. Austin also relates two other instances of what he characterizes as "Unnecessary unexplained delays . . . ." Aff. of Robert L. Austin (5/23/75), ¶ 22.

Along the same lines, Austin states that as of approximately March 1975, Harvester granted the United States Postal Service, including its Manhattan branch, a former Diehl customer, a discount on Harvester parts purchased directly from its depot in Fort Wayne, Indiana. This discount, which is really the dealer's net cost, effectively foreclosed Diehl from any postal business, which in 1974 amounted to $200,000 in sales and $40,000 in profits to Diehl.

Schwenter further contends that in 1971 Harvester interfered with Diehl's efforts to obtain bank financing by reporting to the bank in question that Diehl had recently been delinquent in paying its bills on time. Harvester, according to Schwenter, also has, since 1970, been dilatory in processing Diehl's claims for credit for warranty work done by it, for parts returned, and for other items. Diehl's financial position was further worsened, according to Schwenter, by Harvester's pressuring Diehl, in 1972 and 1973, to purchase excessive inventory items (trucks and parts).

Schwenter also claims that Harvester has for a long time granted Hertz Corporation, a competitor of TRAC, discriminatory prices in the form of unrealistically large used truck allowances, extended warranties and labor reimbursements ($17 per hour as opposed to $15 per hour to Diehl) on warranty work, all of which, Diehl contends, amounts to price discounts.

Finally, Schwenter relates Diehl's abortive attempt, prior to cancellation, at selling its dealership. During 1974, Diehl had located one I. G. Sargiss, who expressed a willingness to purchase Diehl for $125,000 plus parts and inventory at book value and Diehl's building at fair market value. Schwenter informed Harvester of the negotiation with Sargiss on March 24, 1975 and was told he could proceed with the discussions. On April 18, Schwenter arranged a meeting for April 21 with Harvester officials in Philadelphia for the purpose of obtaining their consent to the sale to Sargiss. However, when he and Austin met with Harvester officials on April 21, they were not permitted to discuss the proposed sale to Sargiss, but were, instead, given notices of immediate cancellation of the dealership and demanding immediate payment of all amounts due Harvester and IHCC and return of all trucks and parts not yet paid for.

Harvester for its part attributes the deterioration in its relationship with Diehl to the latter's breach of their dealership agreement. According to statements in affidavits submitted by Harvester, Diehl, in November 1970, falsely reported to Harvester that 33 Harvester trucks, not on Diehl's premises, were at an independent body repair shop. A physical check of the body shop's premises by Harvester revealed that only one of the 33 trucks was actually there. Subsequent investigation showed that the trucks had already been delivered by Diehl to its customers without payment having been made to Harvester, as required under their agreement. As a result of this affair, Diehl was reprimanded, placed on a C.O.D. basis and subjected to frequent inventory checks.

Schwenter and Austin both admit that Harvester was not paid in full prior to invoicing trucks to Diehl's customers, but contend that until late 1970 Harvester, although aware, had never complained of this practice.

Harvester has also submitted correspondence between its personnel and Sargiss and a sworn statement by Sargiss indicating that Harvester was interested in placing a new dealership in the area formerly covered by Diehl.

Against that background, we turn to a discussion of plaintiffs' antitrust claims and defendants' motion for their summary dismissal.

*The § 1 Claims*

Diehl alleges that at least since 1965 and continuing to the present, Harvester and IHCC

"together with co-conspirators presently unknown to plaintiffs, have conspired or contracted to restrain trade in, and have attempted and are attempting to monopolize, the distribution and sale and leasing

of Harvester trucks as well as parts and accessories therefor in the New York market . . . ." Supplemental Complaint ¶ 14.

Diehl further alleges that Harvester and IHCC engaged in the following acts, among others, in support of their plan to "eliminate plaintiffs as competitors": charging plaintiffs higher prices for trucks, parts and accessories than were charged to plaintiffs' competitors,[5] including Harvester's own sales branches;[6] compelling plaintiffs to maintain excessive inventories; failing to promptly deliver trucks, parts and accessories ordered by plaintiffs; granting more favorable warranties and credit terms to plaintiffs' competitors; arbitrarily disallowing plaintiffs' warranty claims; inducing actual and potential customers of plaintiffs to deal directly with Harvester branches and generally interrupting the normal good faith dealings between manufacturer and distributor. Supplemental Compl. ¶¶ 14, 15. Diehl contends that these practices were intended to, and did in fact, seriously impair its ability to compete with Harvester's own sales branches. Finally, Diehl alleges that the April 21, 1975 termination of its dealership and the refusal to permit its sale to Sargiss were in furtherance of the conspiracy. Supplemental Compl. ¶ 79.

Based on the affidavits and documents produced by plaintiffs in opposition to defendants' motion, which were detailed above, the court must assume for purposes of this motion that Harvester is engaged in a program of increasing branch sales at the expense of its independent dealers. See particularly Affidavit of James M. Rhodes (5/23/75) and attached documents.

■ In order to sustain the § 1 conspiracy claim, plaintiffs must establish both (1)

a conspiracy, combination or contract, and (2) that such conspiracy, combination or contract is an undue restraint of trade. *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 870 (2 Cir. 1962).[7]

Defendants' attack on the § 1 claim is two-pronged: (1) plaintiffs have failed to plead or to discover any identifiable, independent co-conspirators, as they must ultimately do to sustain their claim, *GAF Corp. v. Circle Floor Co.*, 329 F.Supp. 823, 827 (S.D.N.Y.1971), aff'd, 463 F.2d 752 (2 Cir. 1972); *New Amsterdam Cheese Corp. v. Kraftco Corp.*, 363 F.Supp. 135, 138 (S.D.N.Y.1973); and (2) there is no restraint of trade involved in the elimination of the Diehl dealership.

### Co-Conspirators

Plaintiffs acknowledge the need to show co-conspirators but maintain that they have identified several, e. g., IHCC, Harvester's sales branches and some of TRAC's competitors, such as Hertz and A.A. Truck Renting Corp., and that in any event discovery to date has been inadequate and additional discovery may reveal others. Defendants rejoin with a broad assault on the legal sufficiency of the conspirators named by plaintiffs.

### (a) IHCC

■ As a general proposition, a parent and its subsidiary may constitute independent conspirators for § 1 purposes. *Timken Roller Bearing Company v. United States*, 341 U.S. 593, 597, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Kiefer-Stewart Company v. Seagram & Sons Company*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Company*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).[8]

---

5. This allegation seems to be based on more favorable used truck allowances afforded certain truck leasing companies such as Hertz and AA Truck Renting Corp. See plaintiffs' answers to interrogatories (2/15/74), ¶ 10.

6. Plaintiffs list examples of being undersold by Harvester sales branches in answers to interrogatories dated 2/15/74, ¶ 9.

7. There does not appear to be any activity here which could, even arguably, be considered a *per se* violation, such as a *concerted* refusal to deal. See *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453, 458 (W.D.Pa.1968).

8. The Court of Appeals in *International Rys. of Cent. America v. United Brands Co.*, 532 F.2d

Bearing in mind, however, that the objective of § 1 is the outlawing of truly joint action in restraint of trade, when affiliated corporations are charged with a § 1 conspiracy, the nature of plaintiffs' claim should be carefully analyzed to determine whether antitrust principles are really implicated or whether, in the words of Justice Harlan:

> "this is one of those cases, not unfamiliar in treble damage litigation, where injury resulting from normal business hazards is sought to be made redressable by casting the affair in antitrust terms."

*Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 474, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (Harlan, J., dissenting).

■ Whether or not the affiliated corporations are competing or non-competing is not dispositive; even non-competing affiliated corporations may act in *concert* to adversely affect free market competition, *e. g.,* by tying one product to another, *Battle v. Liberty National Life Insurance Company,* 493 F.2d 39, 44 (5 Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *United States v. General Motors Corp.,* 121 F.2d 376 (7 Cir.), *cert. denied,* 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941); by compelling restrictive purchase agreements, *United States v. Yellow Cab Co., supra;* by fixing maximum resale prices, *Kiefer-Stewart Company v. Seagram & Sons Company, supra.*

■ Here, however, no logical basis is shown for an anti-competitive conspiracy between Harvester and IHCC *as concerns Diehl.* Assuming Diehl's allegations to be true, Harvester and IHCC conspired for the latter to withhold credit from Diehl, thereby aiding Harvester to drive Diehl out of business so as to increase Harvester's share of the retail market for its own products. The fallacy in that theory is that Harvester could unilaterally have driven Diehl out of the market for Harvester products, as it ultimately did on April 21, 1975.

Moreover, not only did Harvester not require the assistance of IHCC in eliminating Diehl as a Harvester distributor, but IHCC had nothing to gain by the cancellation of Diehl's distributorship. Diehl not only did all of its Harvester "floor financing" with IHCC but also placed some of its Mercedes-Benz retail credit business with it. Schwenter Aff. (5/23/75), ¶ 50.

Thus, the situation here is not analogous to that in *Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), "in which it was held that a distributor could not be forced out of business through the concerted efforts of the manufacturer *and other distributors." Industrial Bldg. Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1341 (9 Cir. 1970) (emphasis supplied). While Harvester's conduct, as alleged, may be in breach of its contract with Diehl or tortious under State law, there is no demonstrable antitrust objective which is furthered by permitting a charge on conspiracy to be founded of the activities of Harvester and IHCC. Rather the relationship between Harvester and IHCC appears to be akin to that between Walter Kidde & Company and its wholly-owned subsidiary Fyre-Safety, Inc. in *Beckman v. Walter Kidde & Co.,* 316 F.Supp. 1321, 1325–27 (E.D.N.Y.1970), *aff'd per curiam,* 451 F.2d 593 (2 Cir. 1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972), where the court concluded:

> "Assuming that there were some discussions between Kidde and its puppet, Fyre-Safety, which resulted in a refusal to sell to Beckman, the court cannot conclude that such discussions constitute a combination within the meaning of Section 1 of the Sherman Act or that they represent more than internal dialogue leading to a decision on the part of a single business unit to exercise its right to select or disenfranchise a particular distributor." 316 F.Supp. at 1326.

See also *I. Haas Trucking Corp. v. New York Fruit Auction Corp.,* 364 F.Supp. 868, 873 (S.D.N.Y.1973).

(b) *Harvester's Sales Branches*

■ According to plaintiffs, the real objective of the § 1 conspiracy was to promote

231, 240 (2 Cir. 1976), left open the question of whether a group boycott charge could be based on the activities of a parent and wholly-owned subsidiary.

retail truck sales by Harvester's unincorporated sales branches to the detriment of independent franchised dealers. For the purpose of satisfying the co-conspirator requirement of § 1, however, these unincorporated sales branches are on a lesser footing than IHCC.

Although there is authority for the proposition that a manufacturer may conspire within the meaning of § 1 with its wholly or partially owned *incorporated* dealerships, see *Mt. Lebanon Motors, Inc. v. Chrysler Corporation,* 283 F.Supp. 453, 568-60 (W.D. Pa.1968); *Coleman Motor Co. v. Chrysler Corp.,* 376 F.Supp. 546, 552–54 (W.D.Pa. 1974), *judgment vacated on other grounds,* 525 F.2d 1338 (3 Cir. 1975); and also *Rea v. Ford Motor Co.,* 355 F.Supp. 842, 864 (W.D. Pa.1973), *rev'd on other grounds,* 497 F.2d 577, 590 (3 Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *Chisholm Bros. Farm Equip. Co. v. International Harvester Co.,* 498 F.2d 1137, 1142 n. 10 (9 Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974),[9] there is neither precedent nor reasoning supporting an expansion of those cases to *unincorporated* sales divisions. In fact, the case law is all to the contrary. See *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 82–84 (9 Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Poller v. Columbia Broadcasting System, Inc.,* 109 U.S.App. D.C. 170, 284 F.2d 599, 603 (1960), *rev'd on other grounds,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Nelson Radio & Supply Company v. Motorola,* 200 F.2d 911, 914 (5 Cir. 1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 206 (5 Cir. 1969); *Ark Dental Supply Co. v. Cavitron Corp.,* 323 F.Supp. 1145, 1148 (E.D. Pa.1971), *aff'd per curiam,* 461 F.2d 1093 (3

Cir. 1972); *cf. Syracuse Broadcasting Corp. v. Newhouse,* 319 F.2d 683, 687 (2 Cir. 1963).

### (c) *TRAC's Competitors*

Although plaintiffs have repeatedly contended that the objective of any conspiracy to injure Diehl as a viable Harvester dealer was to benefit Harvester's own sales branches, faced with Harvester's summary judgment motion, plaintiffs now proffer TRAC's alleged competitors[10] in the truck leasing business as co-conspirators. Plaintiffs have failed to explain, however, what part TRAC's competitors played in this conspiracy. No contention is made that TRAC's alleged competitors brought pressure to bear on Harvester to force Diehl and TRAC out of business, see *Beckman v. Walter Kidde & Co., supra,* 316 F.Supp. at 1328, and they were not even named as defendants in this action. As discussed above, Harvester needed no aid in eliminating Diehl as a Harvester dealer.

Moreover, there is no antitrust violation from the TRAC competitors' standpoint because their effort, assuming such to be true,[11] to eliminate TRAC as a competitor is analogous to one distributor conspiring with a manufacturer to replace an existing distributor, which has been held not to constitute a § 1 violation. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra,* 416 F.2d at 78; *Ark Dental Supply Co. v. Cavitron Corp., supra,* 461 F.2d at 1094; *Bay-City Abrahams Bros., Inc. v. Estee Lauder, Inc.,* 375 F.Supp. 1206, 1215–16 (S.D.N.Y.1974).

The foregoing discussion indicates that so far plaintiffs have failed to identify any "co-conspirators" for § 1 purposes. Plaintiffs contend, however, that they should be permitted additional discovery to do so.

---

**9.** This court expresses no view as to the soundness of those decisions. See *Syracuse Broadcasting Corp. v. Newhouse,* 319 F.2d 683, 687 (2 Cir. 1963).

**10.** As discussed below under the Robinson-Patman claims, defendants maintain that TRAC does not really compete with those it lists as competitors.

**11.** Nowhere do plaintiffs contend that the motivating force in the alleged conspiracy was a desire of TRAC's competitors to drive Diehl, and through Diehl, TRAC out of business. Even if such were the case, the only action attributable to TRAC's competitors was the passive receipt of preferred treatment.

The court concludes that under plaintiffs' own theory of the case, *i. e.,* that Harvester is trying to increase sales by its own sales branches, there is not, nor could there logically be, any *joint* action of the type proscribed by § 1. Harvester's actions, assuming plaintiffs' charges to be true, are simply the result of an independent business decision which is not actionable under the antitrust laws.

*Restraint of Trade*

█ As a separate ground for dismissing plaintiffs' § 1 claim, defendants maintain that there is no restraint of trade, let alone an unreasonable one, arising out of the elimination of the Diehl distributorship. As discussed more fully under the monopoly claim, there is no contention in this case that Harvester trucks are not reasonably interchangeable with those of other, larger manufacturers, *e. g.,* Ford, Chevrolet, Dodge and GMC. Moreover, there are 23 other Harvester distributors in the New York metropolitan area.

Under these circumstances, the termination of Diehl as a Harvester distributor affected only Diehl, not competition. As it has oft been said:

"[T]he purpose of the Sherman Act is to protect competition, not competitors."

**12.** In *Coleman Motor Co. v. Chrysler Corp., supra,* the Third Circuit held that an unreasonable restraint of trade could arise out of an automobile manufacturer's squeezing an independent dealer out of business for the following reason:

"We note that plaintiff's expert, Dr. Slesinger, testified that while any automobile manufacturer's product has an outer price limit controlled by prices set by competing manufacturers, each manufacturer has a limited range of 'price jurisdiction.' That is, a manufacturer may price his vehicle slightly above the price of a comparable vehicle of a competitor and still be competitive. This range of 'price jurisdiction,' which Dr. Slesinger testified is approximately $200–$300 per vehicle, arises because there are nonprice factors which enter into a consumer's decision to purchase an automobile–*e.g.,* styling, engine performance, transmission quality, dealer convenience and servicing. Accepting Dr. Slesinger's uncontradicted testimony, we perceive an anticompetitive effect from the elimination of the Coleman dealer-

*Checker Motors Corp. v. Chrysler Corp.,* 283 F.Supp. 876, 885 (S.N.D.Y.1968), *aff'd,* 405 F.2d 319 (2 Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).[12]

Thus, even assuming that some conspiracy did exist between Harvester and someone else to eliminate Diehl and TRAC as retailers of Harvester products, such conduct is without antitrust significance. No antitrust objective would be served by holding that a manufacturer cannot terminate its independent distributors and replace them with its own distribution system, *absent a showing that the termination was designed to further some collateral prohibited activity,* such as, enforcing a tying arrangement, eliminating price-cutters, or creating or strengthening a monopoly position, see *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9 Cir. 1972); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283, 287 (6 Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), none of which are even arguably present here.[13]

Finally, it is undisputed that there are other sources of supply available to Diehl and in fact Diehl does already sell Mercedes-Benz products and has contracted for a Volvo dealership.

ship. As long as there are several Dodge dealerships with different owners, they can compete within the narrow range of price jurisdiction for the sales of those persons who want Dodge vehicles. The elimination of an independent dealer diminishes that competition. *Cf. Klor's, supra.* If all independent dealerships were eliminated, Chrysler could eliminate price competition within the full range of price jurisdiction." 525 F.2d at 1347.

If one accepts this position, however, any distributor could argue that competition is adversely affected by his elimination because he *might* charge lower prices than other distributors of the same product for the same manufacturer.

**13.** Nor is there any serious contention in this case that Harvester was attempting through the use of predatory tactics to destroy Diehl as a potential distributor for other truck manufacturers.

*The Monopoly Claims*

The theory of plaintiffs' § 2 claims is that Harvester, through its sales branches, is attempting to monopolize truck sales and leases in the New York area. In order to sustain such a charge, Harvester contends that Diehl must prove (1) a specific intent to monopolize, (2) an overt act or acts, and (3) a dangerous probability of monopolization of a specific product market in a particular geographic market. *Morning Pioneer, Inc. v. The Bismarck Tribune Co.,* 493 F.2d 383, 386 (8 Cir. 1974); *Kreager v. General Electric Company,* 497 F.2d 468, 471 (2 Cir. 1974); see also *American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

Harvester's summary judgment motion is predicated on the largely uncontroverted facts contained in the affidavits of James R. Fruchterman and John B. Frederick, both Harvester employees. Based on personal knowledge and Harvester's business records, Fruchterman states that Harvester had five sales branches, compared to 23 independent dealers in the New York City market alleged in plaintiffs' complaint, ¶ 10, during the relevant period. The five sales branches were in existence since the 1930's. During 1972, Harvester closed one of these branches and in April 1974, closed another, leaving it with only three.[14]

Citing data obtained from R. L. Polk & Company's regional compilation of truck registrations, Frederick states that Harvester's direct sales percentage of the New York truck market, *i.e.,* branch sales, fell from 6.6% in 1970 to 4.5% in 1973. Even Harvester's total truck sales percentage has steadily declined from 12.9% in 1970 to 9.4% in 1973, placing it fifth behind its four major competitors, Ford, Chevrolet, Dodge and GMC. Finally, Harvester's branch sales of heavy-duty trucks in the New York market in 1973 accounted for only 12.7% of this total sub-market; total Harvester sales (branch and dealer) accounted for 19.6% of

the market, placing it second behind Mack Truck. Harvester does virtually no truck leasing in the New York area.

Based on these incontrovertible facts, Harvester maintains that there is no possibility, let alone a dangerous probability, that it could monopolize the New york truck market or any relevant sub-market thereof.

Plaintiffs do not seriously contest Harvester's assertion that there is no dangerous probability of its successfully monopolizing the *entire* New York truck market; they urge, however, that their monopoly claim is not presently dismissible for two reasons: (1) a claim of attempt to monopolize does not require a showing of what the relevant market is, and (2) in actions brought by independent automotive dealers the relevant market may consist of the brand of vehicle produced by the manufacturer, *i.e.,* Harvester trucks.

In support of its first contention, plaintiffs rely on *United States v. E. I. DuPont de Nemours & Co.,* 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1946), and *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9 Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Defendants, however, correctly point out that the two Supreme Court cases are inapposite and the Ninth Circuit case, although not distinguishable, has not been uniformly followed, even in the Ninth Circuit. *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.,* 531 F.2d 910, 919 (8 Cir. 1976); *Coleman Motor Co. v. Chrysler Corp., supra,* 525 F.2d at 1348; *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.,* 508 F.2d 547, 550 (1 Cir. 1974); *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237, 1240 (8 Cir. 1973); *ALW, Inc. v. United Air Lines, Inc.,* 510 F.2d 52, 56 (9 Cir. 1975); *Bushie v. Stenocord Corp.,* 460 F.2d at 121. See also *Bernard Food Industries, Inc. v.*

---

14. According to Fruchterman, this was in accordance with Harvester's nationwide policy of reducing the number of its sales branches and emphasizing sales by independent dealers. As proof, he alludes to the fact that Harvester closed 37 sales branches in fiscal 1974, reducing the total number to 151.

*Dietene Co.,* 415 F.2d 1279, 1284 (7 Cir. 1969); *Periodical Distributors, Inc. v. American News Co.,* 290 F.Supp. 896, 909 (S.D.N.Y.1968), *aff'd per curiam,* 416 F.2d 1330 (2 Cir. 1969); *Diamond International Corp. v. Walterhoefer,* 289 F.Supp. 550, 576–77 (D.Md.1968).

■ This court concludes that the majority view and not *Lessig* correctly states the rule. Without the need to show a relevant market

> "there would be the anomaly that a defendant could be punished for attempting to do what, if accomplished, would be legal."

*Diamond International Corp. v. Walterhoefer, supra,* 289 F.Supp. at 576–77, cited with approval in *Acme Precision Products, Inc. v. American Alloys Corp., supra,* 484 F.2d at 1240. One cannot monopolize or attempt to monopolize in a vacuum. As the Court said in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965):

> "To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure Food Machinery's ability to lessen or destroy competition."

Plaintiffs' second point finds support in three Third Circuit lower court decisions, *Coleman Motor Co. v. Chrysler Corp., supra,* 376 F.Supp. at 561–65, *judgment vacated,* 525 F.2d 1338; *Rea v. Ford Motor Co., supra,* 355 F.Supp. at 876–78, *rev'd,* 497 F.2d at 590, n. 28; *Mt. Lebanon Motors, Inc. v. Chrysler Corporation, supra,* 283 F.Supp. at 461–62, which stand for the proposition that notwithstanding an automobile manufacturer's natural monopoly over its own products at the manufacturing level, if the manufacturer employs predatory practices in attempts to monopolize the retail market in its own product, it may be found guilty of a § 2 violation.

The court in *Rea v. Ford Motor Co., supra,* explained its position as follows:

> "Ford is the only source of Ford and Lincoln-Mercury motor vehicles. A Ford or Lincoln-Mercury dealer must, under the terms of his franchise, fulfill his fair share of the market penetration expected in his area by the manufacturer. He has no place else to go to secure new vehicles for sale. He cannot turn to another of the big three American manufacturers. His investment in facilities and goodwill, if it is to be productive, must be tied in with sales of Ford vehicles. It would therefore seem that the sale of Ford cars is an important sub-market of the market for sales of new cars. The evidence shows that owner loyalty to Ford products is as high as 90%. Hence, it would seem that to apply the fungible product theory, i.e., that every new car is the same as another, is completely unrealistic." 355 F.Supp. at 876–77.[15]

■ This language plainly reveals the flaw in such an approach for it seeks to protect the competitor, and not competition as the antitrust laws were intended. Rather, the accepted test of the relevant product market is the area of *effective competition* in which the defendant operates. *Cf. Standard Oil of California v. United States,* 337 U.S. 293, 299–300, n. 5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); *Tampa Electric Co. v. Nashville Co.,* 365 U.S. 320 327–28, 331–32, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Brown Shoe Co. Inc. v. United States,* 370 U.S. 294, 326, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

---

15. In reversing the lower court decision in *Rea,* the Third Circuit panel seems to have rejected this reasoning, saying:

> "It would also appear that plaintiffs failed to establish a claim under Section 2 of the Sherman Act, since there was no evidence that Ford and its dealers were able to exclude actual or potential competition in the retail trade from the greater Pittsburgh market area and, therefore, had a dangerous probability of achieving monopolization in a relevant market." 497 F.2d at 590 n. 28.

Product competition turns on the reasonable interchangeability of available goods considering price, use and quality. *United States v. E. I. DuPont de Nemours & Co., supra,* 351 U.S. at 380, 404, 76 S.Ct. 994.[16]

Here, Harvester contends that its trucks alone do not constitute a relevant market or sub-market (heavy-duty) because in the context of commercial reality, other brands of trucks, *e.g.,* GMC, Ford, Chevrolet, Dodge, are reasonably interchangeable.[17] See *Packard Motor Car Co. v. Webster Motor Car Co.,* 100 U.S.App.D.C. 161, 243 F.2d 418, 420, *cert denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); *Mogul v. General Motors Corp.,* 391 F.Supp. 1305, 1313 (E.D. Pa.1975). While a determination of interchangeability is basically factual in nature, plaintiffs have not contested Harvester's assertion, supported by affidavits, as they must do to defeat a summary judgment motion. Rule 56(e).[18] See *Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286, 1292–93 (2 Cir. 1974).

In sum, there is here no showing of a public interest to be protected which would support invocation of an antitrust remedy and justify trebled damages as sought in plaintiffs' § 1 and § 2 causes of action. Defendants' motion for summary judgment with respect to Counts One and Eight of the supplemental complaint is accordingly granted. Rule 56, F.R.Civ.P.

*Robinson-Patman Claims*

Both Diehl and TRAC charge Harvester and IHCC in two counts of discriminating

against them in price, promotional allowances and services in connection with the sale of Harvester goods in violation of § 2(a), (d) and (e) of the Robinson-Patman Act (sometimes referred to as "the Act"), 15 U.S.C. § 13(a), (d) and (e). As revealed in answers to defendants' interrogatories, plaintiffs' price discrimination claims fall into two categories: (1) more favorable credit terms, used truck allowances (UTA's) and warranty terms allegedly extended to certain truck rental companies; and (2) lower prices charged Harvester's sales branches for goods sold them, as well as discriminating in favor of those branches in the allocation of goods.

Defendants have launched a multipronged attack on the legal sufficiency of plaintiffs' Robinson-Patman claims as supplemented by discovery to date.

■ Initially, defendants correctly note that since IHCC is, concededly, engaged solely in extending credit, no Robinson-Patman Act claim can be stated against it. Decisions affecting the granting or withholding of credit involve many factors of business judgment and consequently it has been uniformly held that discrimination in credit terms is outside the Act's coverage. *Craig v. Sun Oil Co.,* 515 F.2d 221, 224 (10 Cir. 1975); *Secatore's, Inc. v. Esso Standard Oil Co.,* 171 F.Supp. 665, 668 (D.Mass.1959); *Lang's Bowlarama, Inc. v. AMF, Inc.,* 377 F.Supp. 405, 408–09 (D.R.I.1974); *cf. Skinner v. United States Steel Corp.,* 233 F.2d 762, 765–66 (5 Cir. 1956). This case certainly presents no basis for departing from those precedents.

---

**16.** Plaintiffs are simply wrong in asserting that "The real question is whether there are competitive sources of supply for Plaintiffs." Plaintiffs' Memorandum-In-Opposition To Defendants' Memorandum In Support Of Their Motion To Dismiss, Or, Alternatively, For Summary Judgment, at 15.

**17.** Nor is there any real contention that Harvester trucks are such superior products as to constitute a relevant sub-market. See *United States v. Grinnell Corp.,* 384 U.S. 563, 573–75, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Interna-*

*tional Boxing Club of New York v. United States,* 358 U.S. 242, 249–51, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959).

**18.** In fact, Stephen Nowotarski, a Diehl customer, stated in an affidavit submitted by Diehl that his company uses Mercedes-Benz and Harvester trucks interchangeably. Aff. of Stephen Nowotarski, ¶ 3. Similarly, Schwenter stated in an affidavit that there was considerable competition with Ford and GM in the light truck market in the New York area. ¶ 35.

Nor can intra-company transfers of goods be considered sales for the purpose of comparing them (as to price or allocation) to sales to outsiders, such as Diehl. See *Reines Distributors, Inc. v. Admiral Corp.*, 256 F.Supp. 581, 584–85 (S.D.N.Y.1966). Carried to its logical end, such a policy would require manufacturers to sell to their independent distributors either at cost or forego completely the retail distribution of their own products.[19] If such a result is desirable, it is for Congress to explicitly so legislate.[20]

Additionally, it appears that discrimination in the allocation or timeliness of deliveries does not constitute a Robinson-Patman violation. See *David R. McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc.*, 504 F.2d 52, 55 (4 Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819, 848 (M.D. Tenn.1974).

Plaintiffs are thus left only with their claim that Harvester has violated the Act by affording certain of TRAC's competitors more favorable UTA's and warranties.[21] Harvester argues that this claim is dismissible on several alternative grounds: (1) TRAC and its competitors are truck lessors and the Act only covers sales; (2) TRAC does not purchase trucks from Harvester, only Diehl does; and (3) TRAC does not really compete with those truck leasing companies allegedly receiving favorable treatment. These opposing claims and contentions clearly present factual questions precluding summary disposition at this juncture.

While Harvester appears to be correct in its contention that the Act does not apply to leases, *Lang's Bowlarama, Inc. v. AMF, Inc.*, 377 F.Supp. 405 (D.R.I.1974), plaintiffs correctly point out that a factual question exists as to whether TRAC's lease-purchase agreements more closely resemble purchases than normal leases. See Schwenter Aff. (6/26/75), ¶ 20.[22]

Similarly, while it is true that only a purchaser has standing to assert a price discrimination claim and TRAC does not purchase trucks directly from Harvester (Austin Aff. 2/7/75, ¶ 4), plaintiffs contend that TRAC's purchases of Harvester trucks "was merely placed through Diehl as a matter of bookkeeping, the price to TRAC being identical in each case with the Harvest-

---

19. Another alternative, of course, would be the elimination of independent distributors.

20. In *Danko v. Shell Oil Co.*, 115 F.Supp. 886 (E.D.N.Y.1953), cited by plaintiffs, the court refused to dismiss a Robinson-Patman claim based on discriminatory "sales" by a refiner to its own retail gasoline station. The court there, however, relied on *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), which involved a conspiracy between *partially-owned* subsidiaries and their "parent"; whereas here Harvester's sales branches are not even wholly-owned subsidiaries—they are mere divisions of one legal entity.

Similarly, *Brewer v. Uniroyal, Inc.*, 498 F.2d 973, 977 n. 2 (6 Cir. 1974), cited by plaintiffs, does not support their position here. Although that case did involve a wholly-owned sales outlet (the decision does not reveal whether it was incorporated), plaintiff there did not appeal the trial court's ruling that since Uniroyal controlled the day-to-day operation of the outlet, no Robinson-Patman liability could be found based on intra-company sales.

21. Plaintiffs have supported this allegation factually with the affidavit of Ralph Petrulo, a former Hertz employee.

Defendants urge that discriminatory warranty treatment is not actionable under the Act, citing *Kapiolani Motors, Ltd. v. General Motors Corp.*, 337 F.Supp. 102 (D.Hawaii 1972). In view of the court's decision not to dismiss the Robinson-Patman claims as they pertain to TRAC's alleged competitors, see text *infra*, the court will defer consideration of this argument.

22. For the same reason, while it seems clear that a manufacturer does not violate the Robinson-Patman Act by selling directly to the *ultimate* consumer at a lower price than it sells to its own distributor, *Secatore's, Inc. v. Esso Standard Oil Co., supra*, factual questions exist here as to whether because of the nature of the lease transactions, TRAC and its competitors should be considered ultimate purchasers.

**124**

er price," Schwenter Aff. (6/26/75), ¶ 19. Under these circumstances, it may develop that TRAC should properly be considered a purchaser from Harvester for Robinson-Patman Act purposes. *Cf. FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 352–58, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968).

Harvester also maintains that TRAC does not really compete with Hertz, A.A. Truck Renting, Ryder and Avis based on concessions purportedly made by Austin in his deposition. Since the deposition has not been completed, signed or filed, however, the court is not in a position to evaluate this alleged concession. See footnote 1.

Accordingly, defendants' motion with respect to plaintiffs' Robinson-Patman claims is denied at this time.

*Dealer-Day-In-Court-Act Claim*

Defendants contend that plaintiffs' Dealer-Day-In-Court-Act ("DDICA") claims are subject to dismissal because they fail to allege that Harvester made any wrongful demand enforced by threats or coercion, as required by the statute. 15 U.S.C. § 1221(e).[23] Plaintiffs originally seemed to respond that all that is required to state a claim under DDICA is an allegation of "bad faith" dealing, with which their complaint is replete, citing *Wagner v. World Wide Automobiles Corp.*, 201 F.Supp. 22 (W.D.N.Y.1961); *Blenki Bros. v. Ford Motor Co.*, 203 F.Supp. 670 (N.D.Ind.1962); *Bergen Rambler, Inc. v. American Motor Sales Corp.*, 30 F.R.D. 334 (D.N.J.1962); *Blenki Bros., Inc. v. Chrysler Corp.*, 189 F.Supp. 420 (N.D.Ill.1960).

■ A review of the cases reveals that mere bad faith dealing by a manufacturer with its distributor is insufficient to state a claim under the Act; a wrongful demand enforced by threats of coercion is required. *Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 571 (10 Cir. 1975) (Moore, J.); *Overseas Motors, Inc. v. Import Motors Limited, Inc.*, 519 F.2d 119, 124–25 (6 Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); *Rea v. Ford Motor Co., Inc., supra*, 497 F.2d at 585. Cases cited by plaintiffs do not suggest a different rule.

In later papers submitted to the court, plaintiffs acknowledge that a demand is necessary to state a claim but argue that an express demand is not required, *i.e.*, an implied demand may "be inferred from all the facts and circumstances without a showing of a formal demand." The objective of Harvester's bad faith dealing, according to plaintiffs, was to induce Diehl to terminate its distributorship. See Supplemental Compl. ¶ 40(e). Under ¶ 27(a) of the Sales and Service Agreements, Diehl could unilaterally without reason terminate the distributorship upon not less than 30 days notice.

■ If the trier of fact believes that Harvester did engage in the bad faith tactics alleged by Diehl and did so for the purpose of compelling Diehl to "voluntarily" terminate its franchise,[24] a valid DDICA claim may be proven. See *American Motor Sales Corp. v. Semke*, 384 F.2d 192, 195 (10 Cir. 1967).

■ Moreover, Diehl has alleged that Harvester exerted pressure on it during 1972 and 1973 to purchase and maintain *excessive* inventories of Harvester goods. Supplemental Compl. ¶ 15(b); see also plaintiffs' answer to interrogatory (2/15/74) ¶ 11. If proven, Diehl may be

---

**23.** 15 U.S.C. § 1221(e) reads:

"The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other par-

ty: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

**24.** Under the franchise agreements, Harvester could not unilaterally without cause cancel the distributorship. See ¶¶ 27(c) and 28.

entitled to damages, if any, flowing from such wrongful demand. See *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 515 (10 Cir. 1976). *Cf. David R. McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc., supra*, 504 F.2d at 55–56; *American Motor Sales Corp. v. Semke, supra*, 384 F.2d at 196–97.

Accordingly, Harvester's motion to dismiss the Dealer-Day-In-Court-Act claims is also denied.

## II.

Harvester has also moved for summary judgment on its counterclaim against Diehl for $48,187.72, representing the difference between $172,170.42 Harvester claims Diehl owes it on open account and $123,982.70 in credits concededly due Diehl for returned parts. According to Harvester, the $172,170.42 consists of the following amounts:

| | |
|---|---:|
| Trucks sold and delivered: | $82,526.47 |
| Parts and sundry items: | 80,277.24 |
| Trucks sold after termination of dealership: | 4,428.20 |
| Repairs to damaged trucks: | 1,452.10 |
| Interest to June 30, 1975 on proceeds of sold trucks: | 3,486.41 |
| | $172,170.42 |

■ In opposing Harvester's summary judgment motion, Diehl takes issue only with the last three items listed above but also contends that Harvester has wrongly refused to credit it with $64,990.80, for parts Harvester was, according to Diehl, required to repurchase upon the termination of the dealership; a $4,706 profit stemming from the sale of ten trucks; and $6,193.36 in assorted credits claimed by Diehl. Giving full credit to Diehl's contentions, Harvester would owe Diehl about $37,000.[25]

■ After reviewing the papers submitted in support of and in opposition to Harvester's motion, the court concludes it is not presently in a position to resolve four of the disputed amounts, *i.e.*, $4,428.20,[26] $1,452.10, $3,486.41 and $6,193.36. However, it does appear that Diehl is not entitled to the $64,990.80 credit it claims for parts it seeks to return. Accordingly, even assuming *arguendo* that the unresolved amounts will be decided in Diehl's favor, Harvester is still entitled to judgment in the amount of $27,921.65.[27] Each of the disputed amounts will be discussed below.

### $64,990.80

Diehl contends that Harvester is contractually obligated as a result of the termination of the dealership to repurchase from Diehl all Harvester parts still in its possession "which are salable as new, and with respect to which exact part numbers appear in Harvester's *list of current parts* in effect on the date of termination" (emphasis sup-

---

**25.** Diehl also appears to claim as an offset damages sought under its antitrust claims. Diehl's 9(g) statement ¶ 6. This is not a defense to an action for money owed for goods sold and delivered. See, *e.g.*, *Kelly v. Kosuga*, 358 U.S. 516, 520–21, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).

**26.** This amount relates to the sale of the same ten trucks for which Diehl seeks a $4,706 credit. See discussion below in text.

**27.** Amounts Diehl admits owing:

| | |
|---|---:|
| | $82,526.47 |
| | 80,277.24 |
| Total: | $162,803.71 |

Less amounts claimed by Diehl:

| | |
|---|---:|
| Undisputed: | $123,982.70 |
| Disputed: | 4,706.00 |
| | 6,193.36 |
| Total: | $134,881.06 |

Uncontested amount Diehl owes Harvester: $27,921.65

plied). Diehl cites the fourth paragraph of section 31 of the Sales and Service Agreements in support of its contention. Harvester, on the other hand, maintains that it is obligated to repurchase only salable parts listed in its *parts return list*, not its list of current parts. A reading of the fourth paragraph of section 31, set out in the margin,[28] confirms the correctness of Harvester's position.

Further, Harvester has produced the uncontroverted testimony of Paul Chesney, the Dealer Parts Manager for its Philadelphia Regional Office, that he and several other Harvester employees inspected Diehl's entire parts inventory during the week of May 5, 1975, and repurchased all parts Harvester was obliged to repurchase under section 31 of the agreements plus certain other parts in which Harvester was interested. Aff. of Paul Chesney dated July 3, 1975.

Diehl has come forward with no opposing affidavits as required by Rule 56(e).[29]

**$4,428.20**

Harvester contends that Diehl sold ten trucks to Beers, Inc. but that they had not been delivered prior to the termination of the dealership. Harvester maintains that Diehl agreed to sell the trucks at a price of $11,892.32 each, exclusive of sales tax and the cost of installation of accessories needed to conform to new DOT brake standards, and that the dealer net price is $12,335.12, leaving a balance owed Harvester of $442.82 per truck. Diehl, on the other hand, contends that the dealer net price should be $11,421.72, leaving it with a profit of $470.60 per truck.

A factual question thus exists as to the correct dealer net price. Harvester has offered no proof in support of its position and accordingly is not now entitled to judgment for this amount.

**$1,452.10**

By letter dated June 30, 1975, Diehl's counsel was advised that Harvester was claiming $1,452.10, representing damage to four trucks repossessed from Diehl by Harvester. The letter reflected that documentation for the damage claimed was attached. Diehl responded by letter dated October 3, 1975, claiming that the various charges which comprise the $1,452.10 amount were "exorbitant and unacceptable." No supporting documentation has been furnished and the court is thus unable to rule on this item.

**$3,486.41**

This amount represents Harvester's calculation of accrued interest on the balance due it from Diehl. Diehl does not appear to contest the mathematics involved given the

---

**28.** Section 31, fourth paragraph, reads as follows:

"Upon termination of the agreement, the Company will repurchase from the Dealer those service parts purchased, as service parts, from the Company under this and prior agreements, on hand in the Dealer's place of business, which are salable as new and provided their exact part numbers appear in the Company's *parts return list* in effect upon the date of termination. The prices which the Company will pay for such parts shall be 105 percent of the Company's current F.O.B. factory unit prices to dealers in effect at the time the parts are received by the Company, and less all discounts allowed. Upon request the Dealer will, at his own expense, deliver such parts to the location designated by the Company. The Company shall be released from its obligation to repurchase service parts if the Dealer does not submit his list of parts to the Company within thirty (30) days after the effective date of the termination and return his parts, authorized to be returned, within thirty (30) days after notification to return is received from the Company." (Emphasis supplied.)

**29.** The *letter* dated June 23, 1975 from Diehl's counsel to Harvester's counsel in which the former questions the meaning of "parts return list" in ¶ 31 is plainly insufficient to raise a factual question. Rule 56(e), F.R.Civ.P. Schwenter's statement, in affidavit form, that the parts in question are "salable" (Schwenter Aff., 7/3/75, ¶ 11), is not dispositive of Harvester's contractual obligation to purchase them.

correctness of Harvester's assertion as to the amount owed; it does, of course, disagree as to how much, if at all, it is indebted to Harvester. In view of the fact that certain items remain undecided, the propriety of this amount should abide their resolution.

$6,193.36

Diehl claims credit for ten separate, assorted items totalling $6,193.36. Harvester contends that Diehl has offered no documentary support for these claims. In response, Diehl has submitted copies of numerous documents the significance of which remains unclear. In order to afford Diehl the opportunity to further support its claimed entitlement to these credits, the court will not rule on them at this time.

Accordingly, Harvester is presently entitled to $27,921.65 of the $48,187.72 sought, Rule 56(d), F.R.Civ.P., and may collect that amount from the escrowed funds.[30]

Settle order on ten (10) days notice in conformity with the rulings herein made.

SO ORDERED.

30. By prior order of this court, Diehl was required to place $45,000 in escrow pending resolution of Harvester's counterclaim.