DIEHL & SONS, INC., a New York Corporation, and Truck Rent-A-Center, Inc., a New York Corporation, Plaintiffs,

v.

INTERNATIONAL HARVESTER COMPANY, a Delaware Corporation, and International Harvester Credit Corp., a Delaware Corporation, Defendants.

No. 73 C 1436.

United States District Court, E. D. New York.

Jan. 26, 1978.

**284**

Coudert Brothers, New York City, by James M. Rhodes, Conor D. Reilly, Mark Lebow, New York City, for plaintiffs.

Townley & Updike, New York City, and Kirkland & Ellis, Chicago, Ill., by Donald G. Kempf, Tefft W. Smith, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This is a private antitrust action commenced on September 24, 1973 by Diehl & Sons, Inc. ("Diehl") and its subsidiary Truck Rent–A–Center, Inc. ("TRAC") against International Harvester Company ("Harvester") and International Harvester Credit Corporation ("IHCC"), its wholly-owned subsidiary. By a supplemental complaint filed on May 27, 1975, plaintiffs allege eight causes of action: two claims of conspiracy in restraint of trade, Sherman Act § 1, 15 U.S.C. § 1, and two claims of attempted monopolization, Sherman Act § 2, 15 U.S.C. § 2 (Counts One and Eight); two price discrimination claims under the Robinson-Patman Act, § 2(a), (d), and (e), 15 U.S.C. § 13(a), (d), and (e) (Counts Two and Three); two Dealer-Day-In-Court Act claims, 15 U.S.C. § 1221, *et seq.* (Counts Four and Five); and two pendent State claims (Counts Six and Seven). Harvester has in turn counterclaimed against Diehl for sums allegedly due and owing on open account. On defendants' earlier motion, summary judgment was entered in favor of Harvester and IHCC dismissing plaintiffs' Sherman Act claims, and in favor of Harvester for a portion of the amount it sought by counterclaim. The relevant facts of this case are set forth fully in this court's earlier decision and, accordingly, need not be recounted at this time. See *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110 (E.D.N.Y.1976).

The case is now before the court on defendants' renewed motion for summary judgment in their favor on the balance of the counterclaims and dismissing plaintiffs' remaining claims. Rule 56, F.R.Civ.P. The remaining claims and counterclaims will be treated in turn.

### I.

#### *Robinson-Patman Act Claims*

The earlier decision in this case dismissed plaintiffs' Robinson-Patman Act claims insofar as they purported to state a cause of action against defendant IHCC, and held that plaintiff's allegations that Harvester favored its own sales branches as to price and allocation of goods for resale failed to state a cause of action under the Act. *Diehl,* 426 F.Supp. at 122–23. Plaintiffs were, however, permitted to proceed on the basis of their contention that Harvester had extended more favorable used truck allowances (UTA's) and warranty terms to certain of TRAC's competitors. *Id.,* 426 F.Supp. at 123. The court noted that factual questions existed with respect to Harvester's contentions that (1) TRAC and its competitors are truck lessors; (2) TRAC does not purchase trucks from Harvester; and (3) in any event, TRAC does not really compete with those leasing companies alleged to have been the recipients of favorable treatment. In addition, the court deferred consideration of whether discriminatory warranty treatment is actionable under the Act.

At the time defendants first moved for summary judgment, they had not yet completed or filed their deposition of Robert L.

Austin, one of plaintiffs' principals. On the basis of this now-completed and filed deposition, and the intervening decision of the Second Circuit in *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), defendants now maintain that plaintiffs' price discrimination claims are ripe for summary dismissal. Plaintiffs have responded with a new affidavit of Austin, and argue that the *FLM* case is not dispositive of their claim.

On the basis of the Austin deposition, defendants now argue that plaintiffs are foreclosed from asserting that TRAC's lease-purchase agreements qualify as "sales" for purposes of the Robinson-Patman Act. Relying on the following excerpt from the Austin deposition, defendants maintain that "Mr. Austin and his counsel candidly admitted that TRAC 'was engaged exclusively in the leasing of trucks' and that *none* of its trucks were sold." (Defendants' Reply Mem. at 6):

> "Q—Truck-Rent-A-Center was engaged exclusively in the leasing of trucks; is that not correct?
>
> "A—Correct.
>
> "Q—TRAC did not sell any trucks, did it?
>
> "MR. RHODES [plaintiffs' attorney]: Well, I believe the record is clear. If they engaged in truck leasing, they couldn't sell trucks.
>
> "MR. SMITH [defendants' attorney]: I withdraw the question." Austin Dept. (5/22/74) at 378–79.

■ Defendants contend that the Austin testimony disposes of the issue, previously left open, of whether "TRAC's lease-purchase agreements more closely resemble purchases than normal leases." *Diehl*, 426 F.Supp. at 123. Plaintiffs, however, have conceded throughout this litigation that TRAC was engaged in the leasing of trucks, and have *never* denied that its transactions were denominated "leases." For example, John Schwenter, former Diehl president, had stated, in an affidavit cited in our prior decision (*Diehl*, 426 F.Supp. at 123), that "TRAC used two forms of *lease* in *leasing*

trucks to its customers," a "lease-purchase" agreement and a "full service lease." Schwenter Aff. (6/26/75), ¶ 20 (emphasis supplied). The court did not then view plaintiffs' characterization of TRAC's agreements as "leases" dispositive of their price discrimination claims, and the Austin testimony does not alter that conclusion. Although further probing by counsel might well have elicited facts placing this issue beyond dispute, see *Webber v. Shell Oil Co.*, 1975–1 Trade Cas. 65, 838 (C.D.Cal.1975), the record as it now stands is inconclusive. On a motion for summary judgment the court must draw all permissible inferences in favor of the party opposing the motion. See *Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2 Cir. 1976). Applying this rule to the record as a whole, including the most recent Austin affidavit (10/24/77), ¶ 15, it is necessary to conclude that there is a question of fact with respect to whether TRAC's lease-purchases are within the ambit of the Robinson-Patman Act, which can only be resolved by presentation of evidence at trial.

■ Defendants next argue that plaintiffs' claims of discriminatory UTA and warranty treatment *do not come within the* purview of § 2(d) and (e) of the Robinson-Patman Act, but only, if at all, within § 2(a), and that under *FLM Collision Parts, supra*, only a direct purchaser may press a § 2(a) claim.

By their terms, subsections (d) and (e) of § 2 prohibit a seller from paying compensation for (§ 2(d)) or providing (§ 2(e)) services or facilities related to the "processing, handling, sale, or offering for sale" of the seller's product, unless such treatment is available to all "customers" (§ 2(d)) or "purchasers" (§ 2(e)) "on proportionately equal terms." The courts have uniformly held that the prohibitions of § 2(d) and (e) are "limited to ending disguised price discriminations in the form of advertising and promotional payments and cooperative merchandising programs." *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819, 849 (M.D.Tenn.1974). See *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 351–52, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968); *Rutledge*

*v. Electric Hose & Rubber Co.*, 511 F.2d 668 (9 Cir. 1975); *Kirby v. P. R. Mallory & Co.*, 489 F.2d 904 (7 Cir. 1973), *cert. denied*, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974); *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.*, 71 F.R.D. 341 (E.D. Wash.1975). Thus, one commentator has written that "the legislative purpose and governing judicial rulings confine [§ 2(d) and (e)] to cooperative *promotional* arrangements between the supplier and customer *in connection* with the customer's *resale* of the particular product." F. Rowe, *Price Discrimination Under the Robinson-Patman Act*, 376 (1962) (emphasis in original). Whether the higher UTA's and extended warranties with greater rates of labor reimbursement allegedly afforded TRAC's competitors constituted promotional allowances is a factual question precluding summary disposition of Count III of the supplemental complaint.[1]

■ Similarly, issues of fact pervade plaintiffs' claims under § 2(a) of the Act. This section prohibits a seller "directly or indirectly" from discriminating "in price between different purchasers of commodities of like grade and quality . . . ." 15 U.S.C. § 13(a). The generally accepted rule is that "price" for purposes of § 2(a) means the amount actually paid by the purchaser, that is, the quoted invoice price less any discounts, offsets or allowances afforded the purchaser and not otherwise reflected in the invoice price. 4 Von Kalinowski, Antitrust Laws and Trade Regulation § 27.-03[2], at 27–24. See *Guyott Company v. Texaco, Inc.*, 261 F.Supp. 942, 948 (D.Conn. 1966); F. Rowe, *supra*, at 87. Whether the allegedly discriminatory UTA's and warranties served as offsets against or allowances indirectly reducing invoice prices to TRAC's competitors on trucks purchased from Har-

vester is an issue that must be resolved by the trier of fact. See *Viviano Macaroni Co. v. FTC*, 411 F.2d 255 (3 Cir. 1969); *Glowacki v. Borden, Inc.*, 420 F.Supp. 348 (N.D.Ill. 1976); *National Nut Co. v. Kelling Nut Co.*, 61 F.Supp. 76 (N.D.Ill.1945).

Defendants contend, however, that even if discriminatory UTA and warranty treatment is actionable under § 2(a), the *FLM* decision, *supra*, requires dismissal of Count II of the supplemental complaint. The question presented in *FLM* was whether an incentive allowance plan adopted by the defendant Ford Motor Company violated § 2(a) of the Robinson-Patman Act. Under the plan, authorized Ford dealers (the only purchasers with whom Ford dealt directly) could claim substantial discounts for automobile "crash parts" purchased for resale to independent repair shops; such discounts were not available for parts purchased for resale directly to consumers or to auto part wholesalers like plaintiff *FLM*. Reversing the judgment of the District Court, the Second Circuit held that Ford's pricing policy was not vulnerable under § 2(a) because *all* purchasers—that is, Ford dealers—were identically treated, and Ford was under no obligation "to equalize prices charged to those performing *different* functions in the line of distribution." 543 F.2d at 1026 (emphasis added).

On the authority of the *FLM* case, defendants now argue that TRAC, because it did not purchase trucks directly from Harvester, is incapable of stating a § 2(a) claim against Harvester. See Defendants' Mem. at 10–12. The *FLM* case is, however, readily distinguishable from the case at bar. First, as noted in this court's initial ruling on defendants' summary judgment motion, plaintiffs contend that TRAC's purchases of

---

1. Defendants have cited several cases in support of their contention that discriminatory warranty treatment is not actionable under the Robinson-Patman Act. In none of these cases, however, did the plaintiff allege that favored buyers had been accorded extended (and presumably more valuable) warranties, or allowed higher rates of labor reimbursement for warranty work performed in connection with products purchased from the defendant manufac-

turer. See *Purdy Mobile Homes Builders, Inc. v. Champion Home Builders Co.*, 71 F.R.D. 341 (E.D.Wash.1975) (inferior warranty service); *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819 (M.D.Tenn.1974) (discriminatory allocation and untimely deliveries of automobiles); *Kapiolani Motors, Ltd. v. General Motors Corp.*, 337 F.Supp. 102 (D.Haw. 1972) (payment of fraudulent warranty claims).

Harvester trucks were placed through Diehl solely as a matter of bookkeeping, raising a factual question as to whether "TRAC should properly be considered a purchaser from Harvester for Robinson-Patman Act purposes." *Diehl, supra,* 426 F.Supp. at 123–24.[2] See Austin Aff. (10/24/77), ¶¶ 13–14. In any event, there is no doubt that Diehl was a direct purchaser of Harvester trucks. Second, while Ford sold its crash parts solely to authorized dealers, the gravamen of plaintiffs' remaining Robinson-Patman Act claims is that Harvester sold not only to franchised dealers, but also, through its factory outlets, to truck leasing companies allegedly in competition with TRAC, and that the prices charged these leasing companies were more favorable than those available to Diehl or TRAC. Thus the Second Circuit's conclusion in the *FLM* case that Ford had treated all purchasers equally is wholly inapplicable to the allegations of this complaint.

Last, and perhaps most important, the Second Circuit in *FLM* expressly indicated that its holding was case-specific: "We do not suggest or imply that, if a manufacturer grants a price discount or allowance to its wholesalers (whether or not labelled 'incentive'), which has the purpose or effect of defeating the objectives of the Act, § 2(a)'s language may not be construed to defeat, it." 543 F.2d at 1027. To accept the broad reading of the *FLM* decision urged by defendants would contravene one of the primary motivating purposes of the Robinson-Patman Act: "to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *FTC v. Henry Broch & Co.,* 363 U.S. 166, 168, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). See *FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 348–50, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968); *FTC v. Morton Salt Co.,* 334 U.S. 37, 55, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). The incentive plan at issue in the *FLM* case, it should be noted, was adopted in response to indications from the Federal Trade Commission that it regarded Ford's pre-1968 practice of charging undifferentiated prices for crash parts sold to its franchised dealers, without respect to the purposes for which the parts were bought, to be an unfair trade practice within the meaning of § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, because independent repair shops were forced to pay higher prices than their franchised counterparts. Thus, the Ford plan was intended to *promote,* rather than inhibit, competition between Ford dealers and independent repair shops for auto body repair business. *Id.* at 1023. The placing of independent wholesalers like FLM at a competitive disadvantage was only incidental; indeed, Ford had attempted to avoid this result in formulating an earlier version of the incentive plan, which proved subject to abuses that undermined the objective of aiding independent shops.[3] In the instant case, de-

---

**2.** The court cited *FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 352–58, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), in support of this conclusion. In the *FLM* case, the Second Circuit observed that the Supreme Court's holding in *Fred Meyer* did not constitute an interpretation of "§ 2(a) as requiring a manufacturer to equalize prices charged to those performing different functions in the line of distribution." 543 F.2d at 1026. The Second Circuit was obviously concerned that such a requirement might well result in price fixing proscribed by the Sherman Act. See 543 F.2d at 1026. See also *FTC v. Fred Meyer, Inc., supra,* 390 U.S. at 361, 88 S.Ct. 904 (Harlan, J., dissenting). We find no indication that the Second Circuit intended to hold that price differentials which cause secondary line competitive injury—that is, injury to competition between the seller's favored direct-buying customers and their competitors—are not actionable under § 2(a). See, *e. g., Perkins v. Standard*

*Oil Co.,* 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599, *rehearing denied,* 396 U.S. 871, 90 S.Ct. 36, 24 L.Ed.2d 126 (1969); *FTC v. Morton Salt Co.,* 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); F. Rowe, Price Discrimination Under the Robinson-Patman Act at 172–78 (1962); 4 Von Kalinowski, Antitrust Laws & Trade Regulation, § 30.02[2][a][i].

**3.** As originally adopted in 1968, Ford's incentive allowance plan included sales to independent wholesalers, as well as to independent repair shops, among those qualified for the 20 percent of dealer cost incentive payments. The plan was modified in 1971 because Ford's audits of the program indicated that a substantial number of improper incentive payment claims were being made, including claims for parts sold to independent wholesalers who in turn were reselling the parts to other Ford dealers.

fendants have offered no similar justification for the alleged price discrimination. Accordingly, the *FLM* case cannot be deemed dispositive of plaintiffs' Robinson-Patman Act claims.

Finally, defendants argue, again with reference to the recently-filed Austin deposition, that plaintiffs have failed to show more than *de minimis* competitive contacts between TRAC and its alleged competitors. The court disagrees. First, the specific testimony to which defendants allude does not purport to exhaust all of TRAC's competitive contacts with other truck leasing firms. See Austin Dep. (5/22/74), at 399–400. Second, Austin's deposition testimony is supportive, in our view, of his contention, set forth in his most recent affidavit, that TRAC "was in regular and daily competition for leasing business" with Hertz, Avis, AA Truck Rental Company, Mendon Leasing and other truck leasing firms. Austin Aff. (10/24/77), ¶¶ 14, 17. See also Austin Dep. (5/22/74), at 365–408. The substantiality of TRAC's competition with other truck leasing companies is, therefore, an issue that will have to be resolved by the trier of fact.

## II

### *Dealer-Day-In-Court Act Claims*

■ This court in its prior ruling held that plaintiffs had stated two cognizable claims for relief under the Dealer-Day-In-Court Act ("DDICA"), 15 U.S.C. § 1221, *et seq.* The first of these was Diehl's contention that Harvester had engaged in bad faith tactics intended to induce Diehl to terminate its franchise. *Diehl, supra,* 426 F.Supp. at 124. The second was Diehl's allegation that during 1972 and 1973 Harvester had pressured Diehl to maintain excessive inventories of Harvester trucks and parts. *Id.* at 124–25. The court noted at that time that in order to succeed on these claims, plaintiffs would have to prove that Harvester had made wrongful demands, whether express or implied, "enforced by threats of coercion." *Id.* at 124, citing *Sal-*

co Corp. v. General Motors Corp., 517 F.2d 567, 571 (10 Cir. 1975); *Overseas Motors, Inc. v. Import Motors Limited, Inc.,* 519 F.2d 119, 124–25 (6 Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); *Rea v. Ford Motor Co., Inc.,* 497 F.2d 577, 585 (3 Cir.), *cert. denied,* 95 S.Ct. 126, 419 U.S. 868, 42 L.Ed.2d 106 (1974). Harvester now asserts that plaintiffs have failed to provide a factual basis for their claims, and contends that at the time its franchise agreements were terminated, Diehl was "out of trust" on trucks purchased from Harvester and financed through IHCC, so that its termination was for cause. Plaintiffs in response argue that Harvester had condoned Diehl's out-of-trust truck sales. See Austin Aff. (10/24/77), ¶¶ 19, 20; Reilly Aff. (10/24/77). Both parties cite to a single portion of the Austin deposition to support their respective positions. See Austin Dep. (7/7/77), at 682–96.

After reviewing the Austin deposition testimony, the court finds no basis for departing from its previous ruling that plaintiffs' DDICA claims raise questions of fact which cannot be summarily resolved. See *Unionvale Sales Ltd. v. World-Wide Volkswagen Corp.,* 299 F.Supp. 1365 (S.D.N.Y. 1969). As the Third Circuit has stated:

"[W]hether a manufacturer has acted with sufficient justification to constitute good faith in bringing pressure to bear on a dealer is a factual question the determination of which will depend on the circumstances arising in each particular case." *Rea v. Ford Motor Co., supra,* 497 F.2d at 585.

Accordingly, defendants' motion to dismiss the DDICA claims is again denied.

## III.

### *State Law Claims*

#### A. New York Dealer Act

■ In Count VI of the supplemental complaint plaintiff Diehl seeks damages on the grounds that Diehl's franchise agree-

---

In addition, it appeared that prices charged independent repair shops by both Ford dealers and independent wholesalers had remained essentially unchanged. See 543 F.2d at 1023.

ments were terminated without cause and therefore in violation of the New York Dealer Act, New York General Business Law § 197, *et seq.* Defendants argue that this claim should be dismissed because Diehl was terminated because of its out-of-trust sales of trucks and falsification of records, and that in any event the Act provides for injunctive relief only.

Section 197 provides as follows:

"No manufacturer or distributor, or any agent of such manufacturer or distributor, shall terminate any contract, agreement, or understanding or renewal thereof for the sale of new motor vehicles to a distributor or dealer, as the case may be, except for cause."

Section 199 of the Act provides for a penalty of $1,000 for each such violation, to be recovered in an action brought on behalf of the State. In addition, § 198, added in 1970, authorizes the granting of a preliminary injunction *pendente lite* in any action brought by a dealer or distributor pursuant to § 197.

As noted above, Harvester's contention, with respect to plaintiffs' DDICA claims, that Diehl was terminated for cause is not susceptible to summary adjudication because there is a genuine dispute as to whether Harvester had condoned the very conduct upon which the termination was allegedly based. Essentially the same issue is involved with respect to Diehl's claims under the New York act, and it is no more ripe for disposition here than under the DDICA claim. See *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2 Cir. 1970). Thus, it is necessary to address Harvester's contention that a private *damage* action will not lie for violations of the New York Dealer Act.

The general rule in New York is that " 'statutes which on their face provide penal

sanctions also imply a private right of action.' " *Jones v. Beame*, 86 Misc.2d 832, 382 N.Y.S.2d 1004, 1007 (S.Ct. N.Y. County, Spec. T. 1976), quoting *Barnes v. Peat, Marwick, Mitchell & Co.*, 69 Misc.2d 1068, 1070, 332 N.Y.S.2d 281, 283 (S.Ct. N.Y. County 1972), *modified on other grounds*, 42 A.D.2d 15, 344 N.Y.S.2d 645 (1st Dep't 1973), and citing *Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Thus, " '[a] disregard of the command of a statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied.' " *Beame, supra*, 382 N.Y.S.2d at 1007–08, quoting *Texas & Pacific Ry. v. Rigsby*, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916).

Applying this standard, there can be little doubt that a private action for damages may be maintained by a motor vehicle dealer for violations of § 197. This conclusion is supported not only by the legislative findings that accompanied the 1970 amendments to the Act, see 1970 N.Y.Laws c. 582 § 1, but also by § 198, which plainly contemplates that aggrieved dealers and distributors may bring private actions pursuant to § 197.[4] Furthermore, legislative authorization of preliminary injunctive relief in such actions, rather than precluding actions for damages, suggests a legislative intent to make private enforcement more effective by broadening the remedies available to an aggrieved person.

## B. *Common Law Claims*

Count Seven of the supplemental complaint charges that Harvester wrongfully terminated Diehl's dealership contracts (¶ 68), and, thereafter, committed a series of allegedly tortious acts injurious to

**4.** New York General Business Law § 198 provides as follows:

"Any court of competent jurisdiction may grant a preliminary injunction to a distributor or dealer, which shall be granted for and during the pendency of any action brought by a distributor or dealer pursuant to sec-

tions one hundred ninety-seven or one hundred ninety-seven-a of this article, directing the manufacturer or distributor or both, as the case may be, to continue, in all respects, the requirements of such franchise, contract, agreement or understanding or renewal thereof."

plaintiffs' business (¶¶ 69, 70).[5] Plaintiffs seek both actual and punitive damages.

Under the Sales and Service Agreements, ¶¶ 27(c) and 28, Harvester could not unilaterally without cause terminate the dealership. See *Diehl, supra,* 426 F.Supp. at 124 n. 24. To the extent that Diehl seeks to recover for the allegedly wrongful termination, Harvester's liability, if any, is governed by the terms of the agreements, and the claim is properly one for breach of contract, rather than tort. See *Ryan v. Brooklyn Eye & Ear Hospital,* 46 A.D.2d 87, 360 N.Y.S.2d 912, 916 (2d Dep't 1974); *Stella Flour & Feed Corp. v. National City Bank,* 285 App.Div. 182, 136 N.Y.S.2d 139 (1st Dep't 1954), *aff'd,* 308 N.Y. 1023, 127 N.E.2d 864 (1955); *cf. Wegman v. Dairylea Coop., Inc.,* 50 A.D.2d 108, 376 N.Y.S.2d 728, 734 (4th Dep't 1975). Again, a factual question exists as to whether Harvester's termination of Diehl was for cause, thereby precluding summary judgment.

 Defendants argue that the allegations with respect to their post-termination conduct do not state a claim for relief, and therefore should be dismissed. They contend that under New York law, "all malicious and intentional torts are generally subsumed under the label of *'prima facie* tort,'" and that in order to state such a claim, plaintiffs must (1) specially plead the damages suffered; (2) demonstrate an actual injury; and (3) clearly show, in their pleadings, that "the defendants' *sole motive* was to injure the plaintiff." Defendants'

Mem. at 30–31 (emphasis in original). Plaintiffs concede that they have not complied with the stringent pleading requirements for *prima facie* tort; they maintain, however, that they have made out a claim for the tort of interference with contractual relations, "among others." Plaintiffs' Mem. in Opp. at 15.

At the outset, it should be noted that defendants' contention that *prima facie* tort embraces *all* malicious and intentional torts is without merit. Indeed, the very case upon which they rely for this proposition is squarely to the contrary:

"It seems inadvisable to lump all malicious and intentional harms into a grab bag labelled 'prima facie tort,' especially since it is impossible to tabulate the infinite varieties of misconduct that give rise to actionable wrongs. It is generally accepted that 'There is no necessity whatever that a tort must have a name. New and nameless torts are being recognized constantly.' (Prosser, Torts, 2d Ed., p. 3.)"

*Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.,* 7 A.D.2d 441, 184 N.Y.S.2d 58, 60 (1st Dep't 1959).[6] See also *Morrison v. National Broadcasting Company,* 24 A.D.2d 284, 266 N.Y.S.2d 406, 409, 412–14 (1st Dep't 1965) (Breitel, J. P.), *rev'd on other grounds,* 19 N.Y.2d 453, 280 N.Y.S.2d 641, 227 N.E.2d 572 (1967).

On the other hand, plaintiffs' attempt to base their claim on a theory of tortious interference with contractual relations is

---

**5.** The gravamen of plaintiffs' tort claim is that defendants maliciously made false, fraudulent, and disparaging statements concerning Diehl and TRAC in order to induce plaintiffs' actual and potential customers, suppliers, and creditors to cease doing business with Diehl and TRAC, and that they succeeded in doing so. See Supplemental Complaint, ¶¶ 69–70.

**6.** The court further observed as follows:
"The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow. It has been occasionally suggested that such an action is within the orbit of prima facie tort.

There is no valid support in law for the suggestion. The tort of injurious or intentional falsehood finds its genesis in legal history long, long before the comparatively recent development in the area of intentional harms, which possibly have been misdescribed as 'prima facie torts'. It may well be that much of the difficulty encountered in these cases emanates from the indiscriminate use of labels. If, therefore, one must be attached, perhaps other terms such as 'injurious falsehood' (86 C.J.S. Torts § 48; Salmond, Torts, 11th Ed., pp. 703–704), or an 'action for damage resulting from intentional falsehood' (*Rager v. McCloskey,* 305 N.Y. 75, 80, 111 N.E.2d 214, 217) may be better." 184 N.Y. S.2d at 61.

untenable. Under New York law, this tort has four essential elements: (1) a valid contract between plaintiff and a third party for a specific term; (2) defendant's knowledge of the contract; (3) defendant's intentional procuring of its breach; and (4) damages. See *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956); *Wegman v. Dairylea Coop., Inc.*, *supra*, 376 N.Y.S.2d at 736. Here, the complaint (as well as the record) is devoid of any allegation that defendants procured the breach of an *existing* contract between plaintiffs and third parties. See *Simon v. Norma Electric Corp.*, 293 N.Y. 171, 56 N.E.2d 537 (1944); *Wegman v. Dairylea Coop., Inc.*, *supra; Reale v. International Business Machines Corp.*, 34 A.D.2d 936, 311 N.Y.S.2d 767 (1st Dep't 1970).

Fairly read, however, the allegations of Count Seven do state a claim for unfair competition by disparagement, which has been described as a species of the tort of injurious falsehood. See *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.*, 22 A.D.2d 595, 257 N.Y.S.2d 884, 886 (1st Dep't 1965). According to Dean Prosser, the action is not limited to disparagement of plaintiff's title to or the quality of his goods:

> "The gist of the tort [of injurious falsehood or disparagement] is the interference with the prospect of sale or some other advantageous relation; and it is equally possible to disparage the plaintiff's business by reflecting upon its existence or character, the manner in which it is conducted, its employees or its customers, without affecting any property. . . . [T]he cause of action probably is as broad as any injurious falsehood which disturbs prospective advantage, and it is not necessarily confined even to commercial relations.
>
> \* \* \* \* \* \*
>
> "Injurious falsehood, or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, or even to some element of his personal affairs, of a kind

calculated to prevent others from dealing with him, or otherwise to interfere with his relations with others to his disadvantage."

W. Prosser, Torts § 128, at 919–20 (4th Ed. 1971) (footnotes omitted).

Prosser's analysis finds support in New York case law. Thus, in *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.*, *supra*, Justice Frank distinguished an action for injurious falsehood from one based on a theory of *prima facie* tort as follows:

> "Usually, the utterance of a truth does not provide a basis for redress and imports no wrongdoing, and consequently is not actionable unless, as in prima facie tort, the sole motivation is the intentional infliction of harm resulting in damage. 'The remedy is invoked when the intention to harm, as distinguished from the intention merely to commit the act, is present, has motivated the action, and has caused the injury to plaintiff, all without excuse or justification.' *Ruza v. Ruza*, supra, 286 App.Div. 767, 769, 146 N.Y.S.2d 808, 811. That is not so, however, when the medium that inflicts harm resulting in damage is an untruth. By its very nature a false statement intentionally made is wrongful. If it inflicts material harm upon another, which was or should have been in the contemplation of the actor, and it results in actual damage to the plaintiff's economic or legal relationships, an action may lie. (Prosser [2d ed.] p. 760, et seq.). It logically follows that to sustain a complaint, it is not necessary that the pleading must allege that the defendant was solely motivated to injure the plaintiff. It is enough if the falsehoods charged were intentionally uttered and did in fact cause the plaintiff to suffer actual damage in his economic or legal relationships." 184 N.Y.S.2d at 61.

*Morrison v. National Broadcasting Co.*, *supra*, is to the same effect. See also *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.*, *supra*, 257 N.Y.S.2d at 887; *Union Car Advertising Co. v. Collier*, 263 N.Y. 386, 400–01, 189 N.E. 463 (1934); *Rochester Brewing*

Co. v. Certo Bottling Works, Inc., 192 Misc. 629, 80 N.Y.S.2d 975 (S.Ct.Spec. T., Monroe County, 1948); Keviczky v. Lorber, 290 N.Y. 297, 306, 49 N.E.2d 146 (1943); cf. Advance Music Corp. v. American Tobacco Co., 296 N.Y. 79, 70 N.E.2d 401 (1946).

■■■ The only remaining question is whether plaintiffs' failure to plead special damages is fatal to their claim. Although there is some authority for the proposition that special damages need not be pleaded where an allegedly tortious disparagement of plaintiff's product "directly impeaches the knowledge, skill, integrity, etc. of the owner of the goods as an individual or in respect to his business methods," Payrolls & Tabulating, Inc. v. Sperry Rand Corp., supra, 257 N.Y.S.2d at 887, other cases indicate that the complaint should be dismissed if special damages are not alleged "with sufficient particularity." Morrison v. National Broadcasting Co., 19 N.Y.2d 453, 280 N.Y.S.2d 641, 643–44, 227 N.E.2d 572. See Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., supra, 184 N.Y.S.2d at 62. See also W. Prosser, supra, § 128 at 922. Although the complaint is plainly deficient in this respect, the Austin deposition, which defendants have filed in support of their motion, is replete with allegations which, if proved, would entitle plaintiffs to recover damages. For example, Austin testified that defendants had made false and disparaging statements to two of Diehl's clients, Catholic Cemeteries and Queens Farms, and to Associated Discounts, the firm that provided Diehl's floor plan financing, with the result that Diehl's business relationships with those companies ceased. See Austin Dep. (7/7/77), at 636, 638, 678–81; Austin Dep. (7/8/77), 724–30. We believe these allegations are sufficient to preclude summary judgment in defendants' favor. Inasmuch as these allegations have been presented to the court by defendants, it cannot be said that permitting plaintiffs to amend their supplemental complaint to conform to the allegations of the Austin deposition will operate to defendants' prejudice. Accordingly, plaintiffs are granted leave to so amend their complaint.

## IV.

### Counterclaims

Harvester has also renewed its motion for summary judgment on its counterclaims against Diehl for amounts allegedly owing on open account. Of the $48,187.72 it seeks on its counterclaim, Harvester has previously been awarded $27,921.65. The balance of $20,266.07 represents the following: (1) three items of indebtedness disputed by Diehl; (2) Diehl's claim for a profit of $4,706.00 from the sale of ten trucks, sold to Beers, Inc. but not delivered by Harvester until after Diehl's termination; and (3) a series of credits to which Diehl claims it is entitled. These controverted items could not be resolved at the time of Harvester's initial motion, but Harvester now maintains they are ripe for summary disposition.

### $1,452.10

This amount represents Harvester's claim for damage to four trucks repossessed from Diehl. Harvester had fully documented its claim at the time of its initial motion, see Ruesch Aff. (10/24/75), Exh. B(1)–(4), but the court stayed its hand in order to afford Diehl an opportunity to support its contention that the sum was "exorbitant and excessive." Diehl, supra, 426 F.Supp. at 126. Diehl has failed to do so, and Harvester is therefore entitled to collect the sum represented by this claim.

### $3,486.41

Harvester seeks to recover interest accrued to June 30, 1975, calculated at a rate of 11 percent, on $82,526.47 in notes outstanding on 11 trucks delivered to Diehl and sold out of trust. See Ruesch Aff. (10/24/75), Exh. B; Ruesch Aff. (4/22/75), Exh. 18; Sales and Service Agreements, ¶ 13. Diehl does not deny that it sold these trucks out of trust, see Hearing Tr. (7/3/75), at 41, but argues that Diehl was not indebted to Harvester, and that Harvester in any event is estopped from imposing interest charges because it condoned Diehl's out-of-trust situation. In its final submission Diehl has, however, conceded

that it was Harvester's practice to charge dealers, including Diehl, interest on out-of-trust sales. See Plaintiffs' Surreply Letter (11/28/77), ¶ 4. Although Diehl acknowledges the out-of-trust sales, it correctly argues that its indebtedness to Harvester was substantially reduced prior to June 30, 1975, by a series of largely undisputed items [7] which were or should have been credited to its account. See Ruesch Aff. (10/24/75), Exh. B at 8. Since these adjustments to Diehl's account may bear on its outstanding liability on the 11 notes, the court will not rule at this time on Harvester's claim for accrued interest.

### $4,428.00

Harvester claims $4,428.00 as a balance owing for ten trucks originally ordered by Diehl for Beers, Inc. ("Beers") in February or March of 1974, but not delivered to Beers until after termination of Diehl's franchise. According to Harvester, Diehl agreed to sell the trucks to Beers for $11,892.32 each, exclusive of sales tax and the cost of accessories needed to comply with new DOT brake standards, see Ruesch Aff. (10/24/75), Exh. E (letter of Rhodes to Smith, dated July 1, 1975), although the net dealer cost ultimately was $12,335.12,[8] resulting in a balance owed Harvester of $442.80 for each of the ten trucks. Diehl disputes Harvester's computation of dealer cost, and maintains that it is entitled to a profit from the transaction.[9]

Harvester has computed total dealer cost as follows:

| | |
|---|---|
| Dealer Net | $10,691.44 |
| (Exclusive of Deferred Credit) | |
| Sundry Charges: | |
| Freight/Destination | 224.00 |
| Preparation and Delivery | 55.00 |
| Surcharge | 1,092.90 |
| Flat Charge | 34.18 |
| Deferred Credit | 237.60 |
| Total Dealer Cost: | $12,335.12 |

See Affidavit of M.B. Esler (9/11/77), ¶ 9. Diehl takes issue with each of these items, except the deferred credit, which it agrees should be $237.60. It now maintains dealer cost should be computed as follows:

| | |
|---|---|
| Dealer Net | $10,508.70 |
| (Including Deferred Credit) | |
| Freight and Destination | 189.00 |
| Preparation and Delivery | ——— |
| Surcharge | 1,069.14 |
| Flat Charge | ——— |
| Total Dealer Cost: | $11,766.84 |

Austin Aff. (10/24/77), ¶ 24.

"Product Pricing Letter," indicates that such reinstated orders would be invoiced at prices in effect at the date of shipment, but that dealer cost would be maintained at "the price in effect on the date of the retail order, plus any applicable price escalation (exclusive of Destination Charges and Plant Surcharge)" plus the cost of DOT conforming brakes. See Ruesch Aff. (10/24/75), Exh. C–3 ("Orders for Trucks with DOT Air Brakes," dated October 28, 1974). Since defendants have not indicated who were the intended or actual recipients of this letter, the court has not considered it for purposes of this motion.

---

**7.** Harvester concedes that Diehl is entitled to $123,982.70 in credits, primarily attributable to Diehl's post-termination return of truck parts from its inventory, pursuant to the terms of the Sales and Service Agreements. See *Diehl, supra*, 426 F.Supp. at 125 and n. 27; Ruesch Aff., *supra*, Exh. B.

**8.** This figure does not include the cost of equipment needed to comply with the new DOT brake standards, which applied to trucks manufactured on or after March 1, 1975, and added $1,026.45 to total cost. See Esler Aff. (9/11/77), ¶ 12.

Although the order for the Beers trucks was originally placed in February or March of 1974, with production and delivery anticipated in September of that year, it was cancelled by Harvester on October 8, 1974, purportedly because it could not complete production prior to the effective date of the DOT brake regulations. See Esler Aff. (9/11/77), ¶ 12; Austin Aff. (2/7/75), ¶¶ 10, 11, 13 and Exh. E. Beers, however, agreed to absorb the cost of the DOT equipment and Diehl resubmitted the order on November 14, 1974.

A document submitted by Harvester, dated October 28, 1974, and which appears to be a

**9.** The sums claimed by Diehl as profit have varied from time to time. Thus, while Diehl originally sought $470.06 per truck, see *Diehl, supra*, 426 F.Supp. at 125–26; Rhodes Aff. (10/31/75), Exh. C (letter of Rhodes to Smith, dated June 3, 1975), the most recent Austin affidavit purports to show that a profit of $568.28 per truck was realized on the Beers sale, in addition to which Diehl claims a deferred credit of $237.60 per truck. See Austin Aff. (10/24/77), ¶¶ 22–28.

The parties agree that pursuant to the schedule of prices in effect at the time the Beers order was originally placed, dealer net cost would have been $10,508.70, and Diehl argues that Harvester should be limited to charging this amount. Harvester, however, claims it is entitled to increase this amount by four percent, pursuant to a pricing policy announced on January 7, 1974. See Esler Aff. (11/9/77), ¶ 4, and Exh. A (Product Pricing Letter G–146 [dated 1/7/74]).[10]

Although under paragraph 20 of the Sales and Service Agreements, Harvester sought to protect itself against responsibility for failure to fill orders on time due to various contingencies, in light of Diehl's claim that Harvester wilfully delayed production and delivery of the order in question, see Austin Aff. (10/24/77), ¶ 10; Austin Aff. (2/7/75), ¶¶ 5–18, issues of fact are raised which cannot be decided summarily.[11]

*$6,193.36*

This amount represents ten assorted items Diehl claims should be credited to its account. In support of these items, Diehl has submitted copies of numerous documents. See Rhodes Aff. (10/31/77) and exhibits. Neither party has clarified the significance—or want of significance—of these documents, and the court is therefore unable to rule on them at this time.

Accordingly, Harvester is presently entitled to $1,452.10, representing damage to the four repossessed trucks, Rule 56(d), F.R. Civ.P., and may collect that amount from the escrowed funds.

Settle order on ten (10) days notice in conformity with the rulings herein made.

SO ORDERED.

10. According to this policy, truck orders accepted on or after January 14, 1974, were to be guaranteed at prices in effect at time of order, except with respect to trucks manufactured after the start of the 1975 model year (October 1, 1974), in which case price on date of shipment would control, but not to exceed date-of-order prices by more than four percent. Product Pricing Letter G–146 (1/7/74). The Beers trucks were in fact ordered after this limited price guarantee became effective, and were neither produced nor delivered until after Diehl's termination in April 1975.

11. Similarly, the court cannot at this time determine the merits of Diehl's claim that it is entitled to a profit from the sale of the ten Beers trucks.